

# MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| **STATE OF MISSOURI,** | ) |
| | ) **WD81972** |
| **Respondent,** | ) |
| v. | ) **OPINION FILED:** |
| | ) |
| **LAWRENCE MOSELY,** | ) **February 4, 2020** |
| | ) |
| **Appellant.** | ) |

**Appeal from the Circuit Court of Cole County, Missouri**
**Honorable Daniel Richard Green, Judge**

**Before Division Two:**
**Cynthia L. Martin, P.J., Thomas H. Newton, and Gary D. Witt, JJ.**

Mr. Lawrence Mosely appeals his conviction by a Cole County Circuit Court jury of one count of knowingly distributing marijuana, a controlled substance, and the 24-year suspended sentence the court imposed. § 195.211, RSMo. (2000 & 2003 Supp.).[1] Mr. Mosely challenges trial court rulings allowing certain testimony and evidence, overruling the motion for new trial on the basis of the State's alleged withholding of certain information, permitting the State to make improper arguments in closing while chastising defense counsel for objecting, and refusing to grant a mistrial after the State purportedly commented on Mr. Mosely's failure to testify. We affirm.

---

[1] This offense is now codified at section 579.055.

Mr. Mosely distributed marijuana to Ms. Kalie Kluge in the presence of undercover highway-patrol Trooper Shawn Griggs who paid $130 for the purchase on March 1, 2012. Trooper Griggs alleged that Mr. Mosely displayed a weapon during this drug transaction. Mr. Mosely was also alleged to have distributed marijuana to Ms. Kluge on March 8, 2012. Mr. Mosely was charged with and convicted by a jury in January 2016 of two counts of distribution of a controlled substance in the Cole County Circuit Court, but was acquitted of one charge of unlawful use of a weapon.[2] *State v. Mosely*, 534 S.W.3d 879, 880 (Mo. App. W.D. 2017). On appeal, we reversed for a *Batson* violation and remanded for a new trial. *Id.* at 885. On retrial, the jury convicted Mr. Mosely of one count of distribution of a controlled substance, involving the March 1, 2012, sale but acquitted him of the distribution count involving the March 8, 2012, sale. The court denied Mr. Mosely's motion for new trial and, because Mr. Mosely was a prior and persistent offender, imposed a 24-year prison sentence but suspended its execution, placing Mr. Mosely on five years' supervised probation. Mr. Mosely files this appeal, asking the Court to either dismiss the case for prosecutorial misconduct or remand for a new trial.

"On direct appeal we review the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. We review the facts in the light most favorable to the verdict." *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998).

---

[2] Mr. Mosely had been charged by grand jury indictment with a violation of section 571.030.1(4), RSMo. (2000, as amended through 2011), for knowingly exhibiting, "in the presence of one or more persons a handgun, a weapon readily capable of lethal use, in an angry or threatening manner."

*Uncharged Crime*

In the first point, Mr. Mosely claims that the trial court abused its discretion in "permitting testimony related to the presence of a fire arm [sic] because such evidence violates the appellant's rights to not twice be put in danger of life and liberty and to only be tried for the offense charged." Because he was acquitted of a firearm-related charge arising from the March 1, 2012, incident and "did not face any charges related to the possession of a gun" on retrial, Mr. Mosely contends that evidence that a weapon was used "violated [his] right to be tried for the offense charged and to be free from double jeopardy." The State argues that because Mr. Mosely did not frame the issue in the motion for new trial as a double-jeopardy claim, we may review it, if at all, for plain error. As to this part of the point, we agree.

Mr. Mosely first raised an objection to evidence or testimony about possession of a firearm in a motion in limine, arguing that this evidence would violate the Double Jeopardy Clause and constitute uncharged criminal conduct. Mr. Mosely did not address the double-jeopardy issue when arguing the motion to the trial court. Mr. Mosely objected to the introduction of this evidence during trial, relying on the arguments previously made, but not expressly addressing the Double Jeopardy Clause. The motion for new trial raises the matter solely as error in allowing the State to introduce "evidence of prior bad acts and uncharged criminal conduct." The case cited in support, *State v. Atkinson*, 835 S.W.2d 517, 519-20 (Mo. App. S.D. 1992), discusses only uncharged criminal acts, the danger associated with allowing evidence relating to such acts, and exceptions to the exclusion of such evidence. Accordingly, the double-jeopardy argument was not properly preserved. *See State v. Walter*, 479 S.W.3d 118,

123 (Mo. banc 2016) ("the general rule with respect to preservation of error is that an objection stating the grounds must be made at trial, the same objection must be set out in the motion for new trial and must be carried forward in the appellate brief to preserve it." (citation omitted)); and *State v. Davis*, 564 S.W.3d 649, 656 (Mo. App. W.D. 2018) ("[Appellant] is bound by the grounds specified at trial and cannot change or broaden his theory. The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury.").

Rule 30.20 allows unpreserved claims to be reviewed for plain error at our discretion. Still, "because the right to be free from double jeopardy is a constitutional right which goes to the very power of the State to bring the defendant in the court to answer the charge brought against him," we "should grant plain error review in any case where from the face of the record it appears that the court had no power to enter the conviction." *State v. Wright*, 383 S.W.3d 1, 4 (Mo. App. W.D. 2012). The U.S. Constitution's Double Jeopardy Clause, enforceable against the states through the Fourteenth Amendment, "provides two distinct protections for criminal defendants: (1) protection from successive prosecutions for the same offense after acquittal or conviction and (2) protection from multiple punishments for the same offense." *Id.* Mr. Mosely does not develop his double-jeopardy argument with any particular detail on appeal other than to claim that "[a]s a matter of first impression, acquitted conduct should not be permitted as *res gestae*.[3] According to Mr. Mosely, "[i]f an item is so

---

[3] Because the State has defended its introduction of evidence about the firearm Mr. Mosely brandished and its references to the firearm during trial as *res gestae*, most of Mr. Mosely's argument focuses on this legal theory.

4

integral as to render it impossible for a crime to be understood without evidence of a crime for which the defendant has already been found not guilty, the State should not be able to ignore the double jeopardy clause . . . to remedy this problem." It is not clear to us that the admission of evidence about Mr. Mosely's use of a firearm during the March 1, 2012, drug sale implicates the Double Jeopardy Clause, accordingly we have not passed the threshold for plain-error review, i.e., the existence of an error that is evident, obvious, and clear. *Id. See also State v. Flores*, 437 S.W.3d 779, 794 (Mo. App. W.D. 2014) (seeing no apparent double-jeopardy violation from the face of the record, we declined full plain-error review). The admission of this evidence constituted neither a successive prosecution for the same offense after an acquittal nor a multiple punishment for the same offense.

As for Mr. Mosely's claim that the trial court abused its discretion in admitting evidence of an uncharged offense, we note that courts have broad discretion to admit and exclude evidence during a criminal trial, and we will reverse the court's decision "only if that discretion was clearly abused." *State v. Collings*, 450 S.W.3d 741, 765 (Mo. banc 2014). Missouri courts usually do not admit evidence of an uncharged crime "because that evidence may result in a conviction based upon a crime with which the defendant is not charged." *Atkinson*, 835 S.W.2d at 519 (quoting *State v. Kitson*, 817 S.W.2d 594, 596 (Mo. App. E.D. 1991)). This is so, because "[t]he jury may use the evidence of the uncharged crime to infer the defendant has a general criminal disposition, a bad character, or a propensity or proclivity to commit the type of crime charged, which, in turn, results in the jury basing a finding of guilt on the uncharged crime." *Id.* (citation omitted). Still, a non-exclusive "list of theories for establishing

5

independent logical relevance" that would justify the admission of such evidence includes evidence tending "to establish motive, intent, identity, the absence of mistake, or a common scheme or plan embracing the commission of two or more crimes so related that the proof of one tends to establish the other." *Id.* (citation omitted). Such evidence can also be admitted "to present the jury a complete and coherent picture of the charged crimes." *Morrow*, 968 S.W.2d at 107; *Kitson*, 817 S.W.2d at 597 n.1 (setting forth the parallel exception "which permits proof of another crime, if the other crime is so linked together in point of time and circumstances with a crime charged that one cannot fully be shown without proving the other." Under this exception, "the state is permitted to paint a complete and coherent picture of the crime charged and is not required to sift and separate evidence and exclude the testimony tending to prove the crime for which defendant is not on trial."). The State countered Mr. Mosely's uncharged-crimes claim at trial by arguing that the jury would better understand why an experienced undercover state trooper would immediately exit the vehicle when ordered to do so, as well as to show why the trooper would recall what Mr. Mosely looked like.

Here, Trooper Griggs testified that, after Ms. Kluge arranged the March 1, 2012, drug buy over the phone and Mr. Mosely drove to their location, the trooper got into the back seat on the passenger side of the car. It was about 1 a.m., and the car's interior dome light was illuminated when Ms. Kluge and the trooper got into it. Because Mr. Mosely did not know the trooper, he ordered Trooper Griggs out of the car. As Mr. Mosely did so, according to the trooper, "[h]e then raised a firearm from the center console area of the vehicle and pointed it at the ceiling. Kind of back towards my

direction, but at the ceiling." The prosecutor further asked, "what did he say as he raised that firearm there between you and he?" Trooper Griggs responded, "After stating what's up, bro, and he held that up, he said, you can wait outside. I believe he said, homey. He said, you can wait outside." The trooper further testified that he believed the firearm was a semiautomatic nine-millimeter pistol and that he had a decision to make, "[b]ut the decision was fairly easy. The door was still open if I wanted to remove myself from that situation rather than something else occur." He then got out of the vehicle and moved to the front passenger-side door where Ms. Kluge had gotten into the vehicle and he watched the sale take place. Trooper Griggs testified that he was focused on staying safe, but also focused on the driver of the vehicle "so I could, you know, identify him at a later time." When Ms. Kluge opened the window, she grabbed the money from the trooper and then gave it to Mr. Mosely.

Trying to raise questions about the ability of Trooper Griggs to see the man who sold him the marijuana, defense counsel had the following exchange with him:

> Q. And certainly, I think you said earlier, 100 percent of your attention was on his – on trying to identify the person?
>
> A. Once I had the firearm displayed at me and I was standing outside the vehicle, looking into the window with the two occupants, yes, I was very focused on the person that had done that.
>
> Q. Well, I guess what I don't understand here is were you more concerned about the gun or were you more concered about making ID?
>
> A. I would say first my safety and second being a good investigator and, you know, taking in everything that was going on.

Defense counsel further questioned the trooper about the failure of the highway patrol to obtain the vehicle's license plate number or to recover the bills used to pay for the marijuana. Additional questioning revealed that the investigation did not include trying

7

to ascertain whether Mr. Mosely had owned a vehicle of the type used when the drug sale occurred given its unknown make or model, or whether Ms. Kluge had cell-phone conversations with a number that could be linked to Mr. Mosely. Trooper Griggs also revealed that no effort was made to further identify other young, African-American men who were at the house where the trooper met Ms. Kluge, nor could he identify them other than with general descriptions. Trooper Griggs had picked Mr. Mosely's picture out of group of similar photographs after Ms. Kluge identified him as the man who sold the drugs to the trooper on March 1, 2012.

With the identification of the suspect central to the defense, the accuracy of Trooper Griggs's recall from an interaction that spanned a little longer than a minute to his selection of Mr. Mosely's photo from an array more than two years later was best explained by the presence of a firearm that concentrated the trooper's attention. "Because the State bears the burden of proving guilt beyond a reasonable doubt, it should not be unduly limited in the manner in which it satisfies its quantum of proof." *State v. Watson*, 391 S.W.3d 18, 21-22 (Mo. App. E.D. 2012) (citation omitted) (finding no abuse of discretion in the admission of testimony about a gun in the defendant's waistband as the State is allowed "to present a coherent picture of the events"). And, as the State argues, Missouri courts have ruled admissible evidence concerning the presence of firearms in drug cases, because it shows that the defendant knowingly and intentionally possessed a controlled substance. *See, e.g., Watson*, 391 S.W.3d at 21; and *State v. Brand*, 309 S.W.3d 887, 896-97 (Mo. App. W.D. 2010) (ruling admissible evidence of a firearm on or near the defendant to establish knowing and intentional possession of a controlled substance, "the offense[] for which [defendant] was on

8

trial."). The trial court did not abuse its discretion in admitting testimony about an uncharged criminal act. This point is denied.

*Witness Unavailability*

In the second point, Mr. Mosely argues that the trial court erred in admitting Ms. Kluge's testimony from the first trial because it denied the right to confront his accusers and the State "presented no evidence that the witness was unavailable or unable to testify in any alternative manner or after a continuance."[4] As the point involves an evidentiary ruling, we may reverse on a finding of clear abuse of discretion only, although we review *de novo* a claim that constitutional rights were violated. *State v. Ise*, 460 S.W.3d 448, 459, 461-62 (Mo. App. W.D. 2015) ("When addressing the admissibility of prior testimony, we consider whether (1) the prior testimony was given before a judicial tribunal, (2) the witness was sworn and testified, (3) the accused was present and had an opportunity for cross-examination, (4) the parties and issues were substantially the same as in the case on trial, and (5) the witness is no longer available to testify." (citations omitted)). The U.S. and Missouri constitutions guarantee an accused the right to confront the witnesses against him or her, but an exception to this right "is permitted if the State demonstrates a witness is unavailable." *State v. Christian*, 364 S.W.3d 797, 801 (Mo. App. S.D. 2012). Missouri courts have not often been called on "to scrutinize, from the constitutional standpoint, the sufficiency of the showing of the unavailability of a witness as a predicate to the admissibility of evidence of his testimony in a prior proceeding." *State v. Williams*, 554 S.W.2d 524, 534 (Mo. App. 1977). The court in *Williams*, on the basis of affidavits stating that the witness

---

[4] The transcript of Ms. Kluge's testimony was read to the jury when the State presented its case in chief at Mr. Mosely's retrial.

9

could not testify because he had undergone "very serious surgery," the statements of counsel during a pre-trial hearing as to his unavailability for trial the next day, and information the court gleaned by calling the hospital in which the witness was recuperating, concluded that the trial court did not deny the defendant due process of law in finding the witness unavailable, a matter deemed "collateral" to the proceeding. *Id.* at 532-35. So ruling, the court observed that in federal courts "[i]t is customary . . . to accept statements of . . . counsel as to unavailability of witnesses as a predicate to the use of a deposition." *Id.* at 532 n.5. *See also State v. Lindsay*, 709 S.W.2d 499, 505 (Mo. App. W.D. 1986) (holding as sufficient the evidence of unavailability adduced through the testimony of an attorney and by "other testimony and acknowledgements of certain facts by counsel.").

Ms. Kluge's counsel filed a motion to quash the State's subpoena seeking her attendance as a witness at Mr. Mosely's second trial. The State filed a motion to declare Ms. Kluge unavailable as a witness. When the trial court conducted a hearing on these motions, Ms. Kluge's counsel stated that her client had a medical disability:

> Ms. Kluge is currently pregnant. She has a due date of April 20[th] of this year. I understand the trial date is set for April 17[th]. According to Maternal Fetal Medicine, Division of the University of Missouri Health Care, she has a high-risk pregnancy and has been having several complications including seizures due to stress. She's been unable to work for the last three weeks.

> And she's actually in the process of requesting further medical records from the medical examiners and from the hospital for your review, if you do not quash the subpoena or you choose to require her to be here for the trial.

When Ms. Kluge testified at Mr. Mosely's first trial, she was apparently harassed by an individual attending the trial, and, according to her counsel, Ms. Kluge claimed that

it caused her quite of bit of stress at the time. The transcript from the first trial shows that the trial court found a person in the courtroom in contempt for shouting when Ms. Kluge entered the courtroom:

> THE COURT: Okay. The record will reflect that in open court that this person, when witness Kluge entered the courtroom, she yelled "snitch" in a loud and threatening voice from the gallery and in front of the jury and in open court.
> Ma'am are you aware that your actions are inappropriate?
>
> MS. WEIR: Yes, sir.
>
> THE COURT: And do you have any excuse for your conduct?
>
> MS. WEIR: Just emotional. I do apologize.
>
> THE COURT: Okay. I am going to find you in direct contempt as having an intentional interference with the judicial process.[5]

The prosecutor's chief investigator testified that because Ms. Kluge was living in Florida when the case was first tried, the State was obliged to pay her transportation expenses to ensure attendance. He also testified that Ms. Kluge could be not served and he had been able to communicate with her only via email. He testified that Ms. Kluge "advised me through an e-mail that she is in her eighth month of pregnancy and it's a high-risk pregnancy, and that she has been suffering seizures and is on medication for that currently." According to the investigator, prior telephone and cell-phone contact information for this witness was no longer working, he was unable to find an address for her through a "TLO" skip-tracing program, and he did not seek a Florida subpoena.

---

[5] The trial court took judicial notice of the transcript from the first trial at the pre-trial motion hearing for Mr. Mosely's retrial.

11

The court quashed the State's subpoena directed to Ms. Kluge and indicated that it would not require Ms. Kluge to personally appear at Mr. Mosely's second trial, basing its decision on unavailability due to medical condition.[6] The court also sustained the State's motion to read into evidence Ms. Kluge's prior court testimony. The trial court determined that the State made a good faith effort to secure Ms. Kluge's presence as a witness.[7]

Mr. Mosely argues that even if Ms. Kluge were pregnant "no evidence to support that belief was introduced by the State," and because this is a transient condition, the prosecution should have requested a continuance. He also contends that information which became available after trial allegedly showed that the State "most certainly did not use any degree of diligence. Specifically, it was discovered that, contrary to the claims of the State, [Ms.] Kluge was residing in Jefferson City and had been regularly attending court." Mr. Mosely further claims that "the State possessed communications

_____

[6] Mr. Mosely has indicated that federal courts will continue trial to secure the presence of an unavailable witness, but we would note that the trial had already been rescheduled several times. The first date set for retrial was November 6, 2017. It was rescheduled for April 3, 2018, and then continued to April 17, 2018.

[7] The State attached the investigator's affidavit to the motion in which the investigator addressed his knowledge about her medical condition:

1. I have been advised by Kalie Kluge that anything that is overly stressful, emotional, or causes anxiety, she is not capable of dealing with; it causes her to have seizures.

2. Kalie Kluge is 8 months pregnant with a due date of April 20, 2018, and she is a high risk pregnancy. She has had 3 different seizures this year alone causing the doctors to have to up the dosage of seizure medication she was placed on in July of 2015. She has had a seizure while driving and totaled her vehicle.

3. Kalie Kluge advised that she already has so much going on medically now that it would be impossible for her to feel safe, not functional.

4. Kallie Kluge advised that medically for her safety and the baby's safety, she does not feel comfortable taking any risks that can harm her or her unborn child.

12

from the witness stating that she had done her part and that she does not want to testify."
We find that the trial court did not abuse its discretion in allowing Ms. Kluge's testimony to be read to the jury at the second trial. Counsels' statements and the affidavit about the witness's medical condition were sufficient for the court to conclude that the witness was unavailable due to a medical condition regardless of her geographic location.

Even if we were to determine that Ms. Kluge was available to testify, the State argues that Mr. Mosely was not prejudiced because her testimony was needed only to identify Mr. Mosely as the person selling marijuana to Trooper Griggs on March 8, 2012. On March 8, 2012, the car the drug seller was driving had tinted windows, and the trooper could not see who was in the car when Ms. Kluge got out of it to effect the sale, leaving Ms. Kluge as the only witness who could identify Mr. Mosely with respect to that drug transaction. The jury acquitted Mr. Mosely of the charge related to the March 8, 2012, marijuana sale. Ms. Kluge's testimony from the first trial was cumulative of the trooper's testimony with respect to the identification of Mr. Mosely as the drug seller during the March 1, 2012, sale. Mr. Mosely has not sustained his burden of establishing prejudice, even assuming it was error to permit Ms. Kluge's testimony from the first trial to be read to the jury. This point is denied.

Brady *Violation*

In the third point, Mr. Mosely claims that the trial court erred in denying the motion for new trial as to Ms. Kluge's unavailabiltiy as a witness "in that the State possessed information that the witness was located in Jefferson City, had appeared in municipal court for months, and made statements benefiting the defendant" when "the

State argued that she was unavailable and failed to disclose any of this information to the defense or the court." When the motion was filed, Mr. Mosely attached to it several exhibits, including a post-trial deposition of the prosecutor's chief investigator, an email chain between the investigator and Ms. Kluge, a medical provider's statement about Ms. Kluge's health, and Jefferson City municipal court records relating to a speeding violation with which Ms. Kluge had been charged. Arguing the claim before the trial court during the sentencing hearing, defense counsel claimed that the prosecution had the emails and Ms. Kluge's Jefferson City address, which appeared on the medical provider's statement, before trial and violated *Brady* or the discovery rules in not producing them.[8] No evidence was presented during this part of the sentencing hearing.

"Under *Brady v. Maryland*, due process is violated when the prosecutor suppresses evidence that is favorable to the defendant and material to either guilt or punishment." *State v. Steidley*, 533 S.W.3d 762, 771 (Mo. App. W.D. 2017). Still, "[i]f the defendant had knowledge of the evidence at the time of trial, the State cannot be faulted for nondisclosure." *Id.* The medical provider's document attached to Ms. Kluge's motion to quash the State's subpoena was addressed to Ms. Kluge at a Jefferson City address. At the pre-trial hearing on Ms. Kluge's motion to quash the subpoena, her attorney clearly stated that she was being treated by a division of the University of Missouri Health Care. Accordingly, Mr. Mosely knew more than one week before retrial that Ms. Kluge may not have been in Florida.

---

[8] *Brady v. Maryland*, 373 U.S. 83 (1963).

Although municipal court records may have shown that Ms. Kluge was in Jefferson City in December 2017 and apparently had a Missouri driver's license, they did not prove that she was in or was a resident of Missouri in April 2018, when Mr. Mosely was retried. More to the point, Mr. Mosely does not explain how this evidence was material to the issues of guilt or innocence, or how he was prejudiced by the State's failure to produce the evidence. The trial court declared Ms. Kluge unavailable due to medical condition. That result would not have changed even if her presence in Missouri had been known. The trial court did not abuse its discretion in denying the motion for new trial on the ground that exculpatory evidence may not have been produced.[9] This point is denied.

*Video-Recording Admissibility*

In the fourth point, Mr. Mosely contends that the trial court erred in allowing the State to show to the jury Ms. Kluge's state highway patrol interview in its entirety "because it was improper bolstering, was hearsay, and presented substantial accusations of uncharged criminal conduct in that no legitimate purpose was served by showing the video. . . ."

Mr. Mosely had used the video-recording out of the jury's presence to refresh retired Sgt. Jason Clark's recollection of the interview, particularly as to assurances Ms. Kluge had received in return for her cooperation in Mr. Mosely's case. Because the State wanted to have the entire video admitted and played for the jury, Mr. Mosely

---

[9] Mr. Mosely contends that one statement Ms. Kluge made in an email to the investigator before trial, i.e., that she did "not feel comfortable in proceeding with this" and she had already done her part in 2015, was proof that she had "a firm desire not to testify at trial" and was therefore evidence that she was not credible. The statement was made in the context of an explanation of her medical condition and how the stress of testifying would cause seizures that threatened her health and the health of her baby.

objected that admitting the video would violate the "hearsay confrontation clause." The video-recording was played for Sgt. Clark outside the jury's presence. When the jury returned to the courtroom, Mr. Mosely's counsel asked the witness if his recollection was refreshed and then queried him about any promises made to Ms. Kluge. The witness disagreed with defense counsel on certain points, saying, for example, "I don't know if that was the exact words," "I don't believe so," and "I don't remember [saying something about] all the charges going away. Certainly I would not have the ability to do that." The State then introduced the video-recording during re-direct examination of the officer and offered it into evidence, with Mr. Mosely again objecting on hearsay and confrontation clause grounds. The trial court admitted the video-recording into evidence allowing Mr. Mosely a continuing objection, and it was published to the jury. Mr. Mosely objected as the video-recording was played for the jury because statements about a gun were about to be made, and he again claimed that it represented prior bad acts and violated the U.S. and Missouri constitutions. He moved for a mistrial when the video-recording concluded, stating that the video "is laced with tons of evidence of prior bad acts, drug – other drug deals, trading guns." He also argued that it violated the U.S. and Missouri constitutions because it included evidence of uncharged acts. The court overruled the objection but later gave the jury a limiting instruction before it retired, stating that the evidence in the video-recording "may be considered by you only for the purpose of determining the credibility of Sergeant Jason Clark's testimony. You are directed that you may not consider the statements made by Kalie Kluge in that video as evidence in this case." At closing, defense counsel argued that the recorded interview showed that the officer tried to

"swim around" during cross-examination as to whether Ms. Kluge had been promised that the slate would be wiped clean and none of her statements would be used against her, and he urged the jury to "watch that video again."

We agree with the State that Mr. Mosely failed to raise a bolstering claim when objecting to the admission of this evidence, although this was the basis for his challenge to the video-recording in the motion for new trial. Accordingly, we may review it, if at all, for plain error. The remaining claims of error—hearsay and uncharged criminal conduct—to the extent they may have been preserved, will be analyzed for abuse of discretion.[10]

Regarding the bolstering claim, Mr. Mosely argues that the video-recording improperly bolstered the testimony of the witnesses. He contends that he did not place Sgt. Clark's credibility at issue, but if he did so, only those parts of the video-recording that would have rehabilitated the witness would have been admissible. *State v. Johnson*, 684 S.W.2d 581, 583 (Mo. App. E.D. 1984); *see also State v. McFadden*, 391 S.W.3d 408, 430 (Mo. banc 2013) (stating that while an out-of-court statement of a witness offered "solely to be duplicative or corroborative of trial testimony" constitutes improper bolstering, "[p]rior consistent statements are admissible to rehabilitate the witness." (citation omitted)). In those instances where a statement read into evidence is not confined to the subject matter of the impeachment, the admission is harmless where the statement is cumulative, i.e., where the substance of the witness's trial

---

[10] A general hearsay challenge was made in the motion for new trial, but the interview is not specifically mentioned in the motion in this context. Mr. Mosely referred to Exhibits 1 and 3 in connection with the hearsay and confrontation challenge. Ms. Kluge's video-recorded interview was, however, labeled at trial as State's Exhibit 8 and Defendant's Exhibit Y.

17

testimony is proven by evidence other than the statements. *State v. Hutton*, 825 S.W.2d 883, 887 (Mo. App. E.D. 1992).

We believe that Mr. Mosely's questions were intended to impeach Sgt. Clark who testified about promises made to Ms. Kluge during her interview. The State's sole purpose in publishing the video-recording to the jury was not to improperly duplicate or corroborate Sgt. Clark's trial testimony but was rather to rehabilitate him. And this was what the limiting instruction was intended to focus the jury on. Mr. Mosely has failed to demonstrate evident, obvious, and clear error, so we do not find that the trial court plainly erred in admitting this evidence to rehabilitate Sgt. Clark. To the extent that the admission of the entire video-recording may have improperly bolstered Ms. Kluge's testimony, Mr. Mosely does not specifically discuss this aspect of his bolstering claim, so it has been abandoned and we do not consider it further. Rule 84.04(e); *Lattimer v. Clark*, 412 S.W.3d 420, 423 (Mo. App. W.D. 2013).

Regarding whether the trial court abused its discretion in allowing the jury to view a video-recording of hearsay evidence, as we indicated above, this part of the point was not specifically raised in the motion for new trial. Mr. Mosely simply brought before the trial court a generalized claim about hearsay, without including or specifying the video-recording of Ms. Kluge's interview with Sgt. Clark. Nor does Mr. Mosely discuss this aspect of the point in any detail other than to discuss the bolstering and impeachment issues already addressed. And even if the entire video-recording was improperly admitted, we disagree that it prejudiced Mr. Mosely. Ms. Kluge may have discussed uncharged criminal acts, but only one objection was made while the video-recording was played for the jury, and we have already found that evidence about a gun

18

used in the transaction is admissible as *res gestae,* i.e., to further explain Trooper Griggs's actions, or as a proper exercise of trial court discretion to allow the State to meet its quantum of proof.[11]  Also, anything Ms. Kluge may have said about Mr. Mosely's participation in the drug sales on March 1, 2012, was simply cumulative of other testimony already in evidence.  Because the statements Ms. Kluge made in the video-recording about the March 8, 2012, incident had no bearing on Mr. Mosely's conviction, he cannot show prejudice.  This point is denied.

*State's Closing Argument*

The fifth point raises issues about trial court error in allowing the State to "make many improper arguments and chastising defense counsel for objecting during closing statements."  Mr. Mosely contends that the error violated due process rights "in that the statements were unfairly prejudicial and the judge's conduct ensured that the jurors found such statements to be prejudicial."  The prosecutor made the statements Mr. Mosely challenges in rebuttal, and they fall into one of three categories:  the prosecutor's response to a defense argument about punishment that the prosecutor claimed was improper and intended to scare the jury, the prosecutor's response to defense counsel's challenges to law enforcement witnesses' credibility and reliability, and a statement about the defense's failure to support from the witness stand counsel's

---

[11] The record also shows that Mr. Mosely failed to ask the court, before the video-recording was played in its entirety, to have the State remove any statements relating to uncharged acts and, as indicated above, then urged the jury in closing to watch it again.  By allowing objectionable material to remain in the video-recording played for the jury and then calling on the jury to watch it while deliberating, Mr. Mosely appears to have created a self-invited error or an error of his own choosing.  "It has long been held that a defendant should not be allowed to profit from the existence of errors they create." *State v. Prince*, 518 S.W.3d 847, 855 n.6 (Mo. App. W.D. 2017).

19

claims on opening or in closing.[12]

"The trial court maintains broad discretion in controlling closing arguments. Closing arguments must be examined in the context of the entire record." *State v. Deck*, 303 S.W.3d 527, 540 (Mo. banc 2010). When a claim is preserved, we review for an abuse of discretion—"whether a defendant was prejudiced to the extent that there is a reasonable probability that the outcome at trial would have been different if the error had not been committed." *Id.* Still, prosecutors have "considerable leeway to make retaliatory arguments in closing. A defendant may not provoke a reply and then assert error." *State v. Middleton*, 998 S.W.2d 520, 530 (Mo. banc 1999) (citation omitted); *see also State v. Derennaux*, 535 S.W.3d 395, 403 (Mo. App. S.D. 2017) ("The prosecutor is given even more latitude when responding to issues raised in the defendant's closing argument. Indeed, a prosecutor may retaliate to an issue raised by the defense even if the prosecutor's comment would be improper." (citations omitted)).

Here, defense counsel reminded the jury in closing that Ms. Kluge had testified that she thought she would "get 15 to 25 years per count, almost 30 to 50 years with 10 years of probation on top of that 50 years." Counsel further stated, "That's what she traded. She traded that. She put it on someone else. She wanted somebody else

---

[12] As to the latter, the State argued the following:

> Another rule, as I mentioned earlier, evidence comes from this witness stand. And he had a chance to tell you what his evidence would show and he spent his time doing nothing but arguing at the opening of this trial. I told you what my evidence would be and sat down. And now he wants to throw in there's evidence of this and there's evidence of that. Did you hear anything of that from the stand? Absolutely not.

Mr. Mosely did not object to this statement at trial and did not raise a challenge to it in the motion for new trial. He claims that it was a comment on "the defendant's exercise of his Fifth [A]mendment right not to testify." Because that interpretation is questionable and because the challenge to the trial court's failure to *sua sponte* declare a mistrial when the prosecutor made this statement is raised in the final point before this Court, we do not address it further as alleged error in relation to Mr. Mosely's fifth point.

20

to do her time.  So right away, I mean, that's pretty suspect."  The prosecutor began the rebuttal by referring to defense counsel's argument and claiming he had spent most of his time "talking about what you don't get to decide and have to decide, can't pass on and that's punishment.  That is nothing but a scare tactic to you.  That's improper and uncalled for."  Defense counsel objected, the court overruled the objection, and the prosecutor continued to inform the jury that it does not decide what punishment is imposed.  The prosecutor further stated that "to stand here and talk to you about punishment is improper and wrong.  That's not a burden on you under any sense.  You are going to decide guilty or not guilty, so why would somebody stand up and scare you into doing what's not right?"  Defense counsel again objected, and the court again overruled the objection.  While casting aspersions on defense counsel may not be proper, the prosecutor's argument about punishment was made in response to the argument that defense counsel made regarding the time that Ms. Kluge faced for charges arising from these drug sales, implying that Mr. Mosely would serve that time.

Mr. Mosely cites several cases involving statements a prosecutor made to the jury in closing and contends that what the prosecutor stated in this case was far worse. In *State v. Hornbeck*, 702 S.W.2d 90, 92-93 (Mo. App. E.D. 1985), the statements at issue involved an accusation that the defendant's counsel took measures to ensure that a witness would not be on the witness stand.  According to the appeals court, the statement constituted an accusation, with no foundation in the evidence, that defense counsel had conspired to commit a crime, and the trial court, failing to sustain the objection, "permitted the jury to speculate on defense counsel's complicity in the crime charged."  In *State v. Spencer*, 307 S.W.2d 440, 446 (Mo. 1957), the prosecutor's

21

statement about the defendant—a prominent young man from a prominent family—was not made in response to statements of defense counsel and was, according to the supreme court, an appeal to the jury to convict the defendant on the basis of something other than evidence, that is, prejudice. We do not believe that the prosecutor's arguments here rose to this level, and given the leeway accorded to prosecutors responding to defense counsel claims, we cannot conclude that the trial court abused its discretion in overruling Mr. Mosely's objections to this part of the prosecution's closing.

Mr. Mosely's counsel devoted considerable attention in closing to the officers who testified, and he (1) stated that he did not know if they were lying, but they certainly could have been mistaken, (2) reminded the jurors about the officers' "evasiveness" on the witness stand, saying that it "speaks volumes," and (3) also challenged Trooper Griggs's training to identify individuals of a different race and his ability to focus on the suspect when he was under stress. Regarding Trooper Griggs testifying that he had absolutely no trouble identifying someone of another race, Mr. Mosely's counsel stated that that "goes to his credibility, the fact that he's not even willing to be honest with himself and say, yeah, maybe it's difficult. . . . It's a problem, but what's more of a problem that he wasn't honest with you, ladies and gentlemen." As to Sgt. Clark, Mr. Mosely's counsel acknowledged that he was a nice guy, but also said he could have made mistakes and argued that he "did his best to try to swim around and say things like, well, that's not exactly what I said when I asked about the slate being wiped clean and having talked to the prosecutor and understanding that none of this would be used against [Ms. Kluge]," when testifying about what he had promised

22

Ms. Kluge during the interview. In response, the prosecutor stated that people "think it sells well to juries to go after law enforcement officers," and argued that the video-recording of Ms. Kluge's interview gave the jury the opportunity "to sort that out that the defense was falsely accusing [Sgt. Clark] of him being wrong." Defense counsel objected to this statement as a mischaracterization of the evidence, and the court overruled it stating, "The jury will be guided by the recollection of the evidence as they recall it." Again, we do not believe that the prosecutor's arguments here rose to the level of misconduct shown in the cases Mr. Mosely cites, and, given the leeway accorded to prosecutors responding to defense counsel claims, we cannot conclude that the trial court abused its discretion in overruling Mr. Mosely's objections to this part of the prosecution's closing.

The trial court chastised Mr. Mosely's counsel, telling him to sit down when he sought permission to approach the bench to object to the prosecutor's statement that Ms. Kluge had been declared unavailable. During the State's rebuttal closing argument, when Mr. Mosely's counsel raised an objection, the prosecutor stated in front of the jury, "I didn't stand up and interrupt him, your Honor." The court responded, in front of the jury, "I understand that," and then conducted a bench conference outside the jury's hearing. The trial court stated to Mr. Mosely's counsel, "He didn't interrupt you. Don't interrupt him." Counsel asked the court, "So I'm not allowed to make objections?," and the trial court responded, "You do whatever you think is in your client's best interest." Three pages of transcript later, the following exchange occurred:

[DEFENSE COUNSEL]: Objection. Unavailable.

[PROSECUTOR]: They are talking about –

23

[DEFENSE COUNSEL]:   Permission to approach?

THE COURT:  Sit down.  Sit down, Mr. [Defense Counsel].  Sit down.

[DEFENSE COUNSEL]:  I need to make a record, Judge.

THE COURT:  No.  Sit down.

The prosecutor made no further reference to Ms. Kluge's availability, and the trial court allowed defense counsel to make a record on the objection after the jury had been excused from the courtroom to deliberate.  When asked what relief Mr. Mosely sought for the alleged improper reference to the witness's unavailability, defense counsel called for a mistrial.  Mr. Mosely does not argue that the trial court erred in overruling the request or in failing to declare a mistrial; rather, he contends that by "chastising" and "yelling" at counsel when he attempted to approach the bench to argue an objection and by commanding that he sit down, the trial court "amplified the prejudicial effect of the State's remarks."  The written record, of course, does not indicate whether the trial court actually yelled at defense counsel, and Mr. Mosely did not make this claim in the motion for new trial.[13]   Instead, in the motion for new trial, Mr. Mosely claims only that it was error for the trial court to "chastise" defense counsel in the jury's presence.

---

[13] That our courts do not put much stock in how a trial court's remarks are characterized on appeal is reflected in cases such as *State v. Thomas*, 791 S.W.2d 861, 863 (Mo. App. E.D. 1990) ("Finally, comments by a judge depend largely upon tone of voice, facial expressions and other similar facts which give content to the trial episodes and the rulings thereon.  Since those factors are not reflected in the cold record on appeal, an appellate court must largely defer to the trial court's superior vantage point to appraise the trial situation."); and *State v. Nevills*, 530 S.W.2d 52, 54 (Mo. App. E.D. 1975) (finding trial court's threat to hold defense counsel in contempt did not constitute plain error, court also observes, "An appellate court cannot totally reconstruct the atmosphere of a trial and all the intangible factors that might lead counsel to believe that his client has been prejudiced by a remark of the court.").

24

The high standard that is applied to judicial conduct during jury trials has been articulated in the following way:

> Under our system of jury trials, the judge before whom the trial is conducted has a deep responsibility for the orderly and dignified conduct of courtroom proceedings. When the issue is one which may imprison the defendant on trial in a criminal cause, the tension of the courtroom drama and the human frailties and emotional factors inevitably involved serve but to make the judge's task more difficult. Order and decorum must be maintained. The factual inquiry must be conducted within the issues and at all times under the applicable rules of law. Even if counsel or others should be guilty of misconduct the judicial calmness and the dignity and the self-restraint and obvious impartiality of the judge must always be maintained and made manifest. The judge must not indicate a belief in either the guilt or innocence of the accused. Nor may he let such belief be reflected or even conjectured by the jury in his treatment of either counsel. We know that juries are inclined to draw conclusions and are quite sensitive to any indications of the judge's belief as to the merits of the issue being tried.

*State v. Montgomery*, 251 S.W.2d 654, 657 (Mo. 1952). "No paper record, such as we have in appellate courts, will fully disclose trial atmosphere, or jury mood or sensitivity to remarks and incidents of doubtful propriety." *Id.* Still, we examine the context and words in each case, understanding that trial judges "should be empowered to clarify obscurity in issues or evidence, prevent unnecessary delay, and promote the expeditious, fair and dignified course of trial." *State v. Kennedy*, 726 S.W.2d 884, 887-88 (Mo. App. S.D. 1987) (citations omitted). Where the trial judge's comments "were of such a nature as would reasonably tend to prejudice the minds of the jury against the defendant and thereby deny him a fair and impartial trial, the verdict cannot stand." *State v. Dixon*, 463 S.W.2d 783, 785 (Mo. 1971) (citations omitted). "The question whether appellant's rights were violated must be determined from the whole record." *Id.* at 785 (citation omitted).

Although defense counsel responded to the trial court's direction that he sit down by saying that he needed to make a record about the State's reference to Ms. Kluge's unavailability, when he was later permitted to do so outside of the jury's presence, counsel asked for a mistrial. This request, however, was limited to Mr. Mosely's claim that the State's argument was highly prejudicial. Mr. Mosely made no argument and sought no relief based on the contention that the trial court's direction that he sit down was prejudicial. This claim was not made until Mr. Mosely's motion for new trial. Because Mr. Mosely first challenged the trial court's open-court admonition in the motion for new trial, this alleged error has not been preserved for review. *See State v. Nevills*, 530 S.W.2d 52, 54 (Mo. App. E.D. 1975) (reviewing trial court's threat to hold counsel in contempt for plain error because counsel failed to raise the objection when the comment was made, but noting that a court's remarks could be so prejudicial "that their effect is considered ineradicable" and thus may be reviewed for plain error). Accordingly, we will review this part of point five for plain error. Rule 30.20.

In *State v. Montgomery*, 251 S.W.2d at 656-57, the trial court similarly instructed defense counsel to sit down after the prosecutor had objected to a question posed by defense counsel in cross-examination and the court had threatened to fine defense counsel for contempt. There, however, while the supreme court characterized the statement "[s]it in your chair please" as a "most humiliating and shameful situation" that "was very prejudicial to the defendant," other circumstances in the case further demonstrated the trial court's "clear animosities." *Id.* at 658. As well, the prosecutor "transgressed the bounds of proper and legitimate arguments" in closing by making

intimations, allowed by the court over objection, that he knew of "facts tending to establish the guilt of the defendant on trial, and which [were] not in evidence, or which for some reason could not be introduced in evidence, or which, if the jury but knew such facts, would cause them to return a verdict of conviction." *Id.* Based on this record, the supreme court determined that the defendant was not accorded a fair trial, thus warranting reversal and remand for a new trial. *Id.* The court cited *State v. Davis*, 225 S.W. 707, 710 (Mo. 1920), in which the supreme court similarly reversed a conviction and remanded for a new trial where the record included more than one instance "indicating impatience of the court with counsel for the defense." These instances concluded in an exchange resulting in the court fining defense counsel $50 in open court for contempt after counsel had made an objection that was deemed on appeal not beyond his rights but "which the [trial] court did not permit him to make." *Id.*; *see also State v. Hicks*, 438 S.W.2d 215, 220-21 (Mo. 1969) (citing multiple instances of trial court's "obvious hostility" exhibited toward defense counsel in the jury's presence, as well as multiple legal errors, court reverses conviction and remands for new trial).

In contrast, Mr. Mosely does not argue that the trial court's remarks or conduct directed at him or at defense counsel during trial were in any manner improper with the exception of the challenged exchange during closing. We do not believe that the trial record, examined as a whole, supports the conclusion that the trial court's directive to defense counsel to sit down during closing resulted in the denial of a fair trial for Mr. Mosely. The objection which immediately preceded the trial court instructing defense counsel to sit down was related to the prosecutor's reference to Ms. Kluge's

27

unavailability. This matter had been briefed and argued several times before and during trial, and Mr. Mosely had been given a continuing objection on three separate occasions to any mention of or indication that Ms. Kluge was unavailable as a witness.[14] It appears likely that the trial court's direction to defense counsel to sit down after his objection, in lieu of a bench discussion, was intended to prevent unnecessary delay or jury annoyance given that the same objection had already been repeatedly made and preserved.[15]

---

[14] The trial court considered Mr. Mosely's objection to Ms. Kluge's unavailability at a pre-trial conference and overruled that objection, but advised defense counsel that he could brief the matter and try to persuade the trial court otherwise before her testimony from Mr. Mosely's first trial was read to the jury during the second trial. Defense counsel made his legal argument as to the issue and promised to submit a research brief as soon as possible. Before voir dire, the trial court invited defense counsel to address any additional matters, and counsel referred to the brief on the witness-unavailability issue and again argued the matter. The trial court responded by stating, "Well, I think those are good arguments, and I appreciate you doing all that legal research, but I'm going to, again, allow [the prosecutor] to put on his case the way he feels that he's able to within the laws and the rules of evidence."

Mr. Mosely's counsel then objected to and argued at side bar any mention of Ms. Kluge as unavailable (1) during voir dire and (2) the State's direct examination of the undercover state trooper, (3) after the retired state trooper testified, and (4) before Ms. Kluge's transcript was read to the jury. Three times, Mr. Mosely asked for and was granted a continuing objection on this matter. When Mr. Mosely's counsel indicated that he needed to reiterate any evidentiary objections at each stage of the trial and with each witness to make his record, despite the grant of a continuing objection, the trial court stated that this was not its "understanding of the law." Still, the trial court allowed the argument at side bar on unavailability four times before defense counsel raised the issue again in open court and asked to approach the bench to argue it immediately before the jury retired to deliberate. The venire panel had been told during voir dire that the parties believed trial would start and conclude the day after the jury was selected, but was also cautioned that testimony could spill over to an additional day. This is what occurred, and the final challenged exchange between counsel and the trial court took place at about 2:30 p.m. on the second full day of trial.

This Court stated as recently as 2018 that "[t]he request for a continuing objection . . . signifies the mutual understanding between defense counsel, opposing counsel and the trial court that defense counsel intends to keep his objection alive *throughout* the trial." *State v. McWilliams*, 564 S.W.3d 618, 626 n.5 (Mo. App. W.D. 2018) (emphasis added) (citation omitted). It was entirely unnecessary for defense counsel here to repeat the unavailability objection at each different stage of the trial to properly preserve it for our review. The trial court's understanding of the law was correct, and Mr. Mosely's ability to protect the record was not compromised in any way by the trial court's refusal to allow defense counsel to make the argument for a fifth time at the bench just moments before the jury retired to deliberate. That argument, in any event, was permitted after the jury left the courtroom.

[15] The trial court used a white-noise machine during bench conferences and had earlier in the trial apologized to the jury for the machine's annoying sound.

We do not condone the trial court's open-court admonishment directing defense counsel to "sit down" during the prosecution's closing rebuttal argument. In fact, we find the statements toward defense counsel unbecoming of a trial judge during a trial. We would remind trial courts that counsel should not be subjected to open correction or criticism in the jury's presence when taking steps to protect their clients' interests. We do not believe, however, that this single instance, on its own, would have signaled to the jury that the trial court was clearly hostile to defense counsel or had an opinion as to guilt or innocence. We do not believe that as a result of this single instance Mr. Mosely was not afforded a fair trial. We have found numerous cases where appellate courts have found no reason to reverse a conviction for potentially intemperate trial-court remarks, and we find no reason to do so here.[16] This isolated statement did not rise to the level of manifest injustice supporting plain error review or relief.

In addition, we have been unable to find case law, and Mr. Mosely does not cite any, where a conviction has been reversed because a trial court's alleged "handling of

---

[16] *See, e.g., State v. Stanfield*, 1 S.W.2d 834, 835-37 (Mo. 1927) (affirming conviction after finding trial court's rebuke of defense counsel proper; counsel, who persisted in questioning witness after prosecution objection was sustained, was told by the trial court to "[j]ust sit down there and conduct your examination in a gentlemanly way."); *State v. Teeter*, 144 S.W. 445, 447 (Mo. 1912) (analyzing whether trial court prejudiced the jury against the defendant by stating to defense counsel that he considered them competent to practice only before justice of the peace, court concludes that criticizing defense attorneys during progress of trial is not alone cause for overturning the verdict, as the "remarks did not indicate how [trial court] thought the case ought to be decided."); *State v. Koonce*, 731 S.W.2d 431, 441-42 (Mo. App. E.D. 1987) (finding no prejudice or plain error in three statements made in open court to defense counsel, court lauds trial court for showing great patience with defense counsel and sets forth "factors used to determine the propriety of any comment" including "whether it was volunteered by the trial judge, was not made in response to an objection as part of the court's ruling, was made in the presence of the jury, or could have been construed by the jury to prejudice the defendant."); *State v. Hudson*, 950 S.W.2d 543, 548 (Mo. App. W.D. 1965) (finding that trial court's use within jury's hearing of the word "ridiculous" in characterizing defense counsel's cross-examination did not rise to level of "manifest injustice" under plain-error review; also noting that trial court "neither expressed an opinion on the evidence nor commented on [defendant's] guilt or innocence. Trial judges are not stone statues. When trial counsel propound irrelevant or misleading questions to a witness to affect absurdity, reaction by the trial judge is understandable"; and observing, "The trial court's comments were directed at controlling the court proceedings.").

a defense objection amplified the prejudice" of a prosecutor's closing arguments, particularly where, as here, those closing arguments were not improper. Because we have determined that the trial court did not abuse its discretion in overruling Mr. Mosely's objections to the prosecutor's rebuttal argument, we do not find any prejudice, amplified or otherwise, to Mr. Mosely. This point is denied.

*Fifth Amendment Right*

In the sixth and final point, Mr. Mosely argues that the trial court erred by not *sua sponte* declaring a mistrial when the State made "an improper comment on his right to remain silent." The prosecutor's statement about evidence coming from the witness stand is set forth above. It does not in any way refer to or implicate Mr. Mosely's right to remain silent. Mr. Mosely made no objection at trial when the statement was made and did not raise this matter in the motion for new trial. Accordingly, we may review it, if at all, for plain error. "Plain error relief as to closing argument should rarely be granted and is generally denied without explanation. *State v. Barton*, 552 S.W.3d 583, 589 (Mo. App. W.D. 2018). "This is because the absence of an objection during arguments means that any trial court intervention would be uninvited and may cause increased error." *Id.* We may reverse for improper closing argument on plain-error review only "when it is established that the argument had a decisive effect on the outcome of trial and amounts to manifest injustice." *Id.* (citation omitted). Mr. Mosely has not shown that the statement, an isolated comment on all of defense counsel's remarks about the evidence, had a decisive effect on the outcome. This point is denied.

## Conclusion

Finding no error in the trial court's rulings, we affirm.

/s/ *Thomas H. Newton*

Thomas H. Newton, Judge

Cynthia L. Martin, P.J., and Gary D. Witt, J. concur.