

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | OPINION |
| | ) | |
| v. | ) | WD82619 Consolidated with |
| | ) | WD82620 |
| MICHAEL L. OGLESBY, | ) | |
| Appellant. | ) | FILED: JANUARY 26, 2021 |
| | ) | |

**Appeal from the Circuit Court of Jackson County**
**The Honorable Marco Roldan**

**Before Division Four: Cynthia L. Martin, Chief Judge, Presiding,**
**Mark D. Pfeiffer, Judge and Anthony Rex Gabbert, Judge**

Michael Oglesby appeals the circuit court's judgment, entered on a jury verdict, convicting him of seven counts of first-degree statutory sodomy in violation of Section 566.060, RSMo Cum. Supp. 2013, and four counts of first-degree child molestation in violation of Section 566.067, RSMo Cum. Supp. 2013. Oglesby argues on appeal that the circuit court, 1) erred in denying his motion to set aside the verdicts on the charges from the June 2018 indictment and order a new trial on the remaining four charges from the first trial, arguing the trial and convictions on the June 2018 charges violated his right to be free from double jeopardy, 2) erred in denying Oglesby's

motion to set aside the verdicts on the charges from the June 2018 indictment and order a new trial on the remaining four charges, arguing the June 2018 indictment represented prosecutorial vindictiveness, 3) erred in denying Oglesby a new trial due to prosecutorial misconduct, and 4) erred in quashing Oglesby's December 2018 subpoenas to depose K.O., A.O., and N.O. We affirm.

## Factual and Procedural Background

Oglesby was initially charged with eight counts of sexual offenses against his adopted daughter, K.O., which were tried in May 2018. The jury acquitted Oglesby of four counts -- one first-degree statutory sodomy charge alleging Oglesby engaged in contact with his genitals and K.O.'s hand, one first-degree statutory sodomy charge alleging Oglesby exposed his penis to K.O. and told her to kiss it, one charge of sexual misconduct alleging Oglesby exposed his penis to K.O., and one count of first-degree statutory sodomy alleging Oglesby knowingly touched K.O.'s genitals with his mouth. The jury was unable to reach a verdict on two counts of first-degree statutory sodomy alleging Oglesby touched K.O.'s genitals with his hand, and two counts of first-degree child molestation alleging Oglesby touched K.O.'s breasts with his hand.

On June 8, 2018, a Grand Jury indicted Oglesby on seven counts of sexual offenses involving two of his other adopted daughters, A.O. and N.O. In January 2019, these charges were tried along with the remaining four from his first trial. All counts stemmed from an August 31, 2016, Children's Division hotline call which alleged sexual and physical abuse by Oglesby toward his children. A Children's Division investigator interviewed Oglesby's eight adopted children; K.O. (age twelve at the time of disclosure), A.O. (age eleven at the time of disclosure), and N.O. (age ten at the time of disclosure) independently disclosed sexual abuse. Videotaped Child

2

Protection Center forensic interviews were conducted using anatomical diagrams; these were shown to the jury. K.O. and N.O. testified at trial, as did other witnesses for the State. Oglesby testified in his own defense, as did Oglesby's wife and oldest adopted daughter. On January 10, 2019, a jury convicted Oglesby of all eleven counts. This appeal follows.

Oglesby does not contest the sufficiency of the evidence to support his convictions. Consequently, we need not discuss in explicit detail the evidence of sodomy and child molestation presented at trial. Evidence will be discussed below as necessary to address Oglesby's points on appeal.

**Point I – Double Jeopardy**

In his first point on appeal, Oglesby contends that the circuit court erred in denying his motion to set aside the verdicts on the charges from the June 2018 indictment and order a new trial on the remaining four charges from the first trial. He argues that the rule against double jeopardy, and the common law, prohibit a defendant who has been acquitted on a charge from being charged with new counts of which the prosecution had prior knowledge, and that are related in time, place and manner to the one of which he was acquitted. He contends that, when evidence on unlawful charges is intertwined with that on lawful charges, a new trial is required on the lawful charges. He claims that, all of the charges in the June 2018 indictment were related in time, place, and manner to the four counts of which Oglesby was acquitted. Further, the State had all of the information regarding the June 2018 charges before the first trial, and the evidence at the second trial that the State presented on those additional charges was intertwined with the evidence it presented on the four charges remaining from the first trial.

3

Oglesby concedes that this issue was not preserved and may be reviewed for plain error only. Rule 30.20 authorizes this court to review, in its discretion, "plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "Our Supreme Court has established a threshold review to determine if a court should exercise its discretion to entertain a Rule 30.20 review of a claimed plain error." *State v. Carl*, 389 S.W.3d 276, 287 (Mo. App. 2013). We first determine whether the claimed error facially establishes substantial grounds for believing there has been a manifest injustice or miscarriage of justice. *Id.* Without such a showing, we should decline to exercise our discretion to conduct plain error review. *Id.* In the context of an unpreserved double jeopardy claim, we "will conduct plain error review of an unpreserved double jeopardy claim if the alleged double jeopardy violation is determinable from the face of the record." *State v. Roggenbuck*, 387 S.W.3d 376, 381 (Mo. banc 2012) (internal quotation marks and citation omitted). "If [] we conclude that we have passed this threshold, we may proceed to review the claim under a two-step process pursuant to Rule 30.20." *Carl*, 389 S.W.3d at 287. *Id.* First, the court must determine whether the trial court actually committed evident, obvious, and clear error that affected substantial rights. *State v. Barton*, 552 S.W.3d 583, 589 (Mo. App. 2018). If so, in the second step the court must determine whether the evident, obvious, and clear error found resulted, or will result, in manifest injustice or a miscarriage of justice. *Id.*

We find no double jeopardy violation determinable from the face of the record; consequently, Oglesby fails to make a threshold showing that plain error review is warranted. The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. While

4

Oglesby argues that "[t]hese rights implicitly include a claim-preclusion or compulsory-joinder effect, such that once a defendant is acquitted on a charge, the State cannot go back and charge him with charges related in time, place, and manner, and of which it had prior knowledge," he fails to provide any precedent to support that his acquittal on charges regarding one alleged victim precluded the State from bringing charges regarding additional victims.

The only Missouri case Oglesby cites for his position is the 1910 case of *State v. Tatman*, 132 S.W. 42, 43 (Mo. App. 1910), which involved the sale of intoxicating liquors. Oglesby argues that *Tatman* held that the "State could not try the defendant piecemeal" and supports that, if the State is aware of additional crimes committed by a defendant which are related in time, place, and manner, the State must prosecute those crimes contemporaneously or waive the ability to later bring charges if the trial of any one of those crimes ends in acquittal. This, he contends, is because *Tatman* concluded that, charging the defendant with selling liquor a second time on a specific day, after the defendant was acquitted of selling liquor in another instance on that same day, resulted in double jeopardy.

We read the facts and implications of *Tatman* differently. *Tatman* discusses that, when prosecuting for the sale of intoxicating liquors (in 1910), the State could introduce evidence of a liquor sale that occurred on *any* day within a year prior to filing the information, notwithstanding the fact that the State alleged that the sale occurred on a *specific* day. *Id.* If the State offered evidence of more than one sale at trial, a defendant could not be later tried on any of those separate sales that were in evidence. *Id.* Tatman allegedly made two sales of liquor on June 23, 1909, within one hour of each other. *Id.* He was charged the following day with having sold intoxicating liquors "on or about the 23rd day of June, 1909." *Id.* He was tried in July 1909 and acquitted. *Id.*

5

In August 1909, the State filed another charge alleging the sale of intoxicating liquors "on or about the __ day of June, 1909," leaving the exact date unspecified. *Id.* Tatman was convicted of this charge and he appealed on double jeopardy grounds. *Id.*

The question in *Tatman* was whether the defendant was tried and acquitted in July 1909 for the sale the State charged him with in August 1909. *Id.* ("So this case turns on a question of fact: Was defendant tried and acquitted before the justice of the charge as to both sales?") *Id.* Tatman, filing a plea of *autrefois acquit*, contended that he had been tried for both sales in the first trial; the State contended that Tatmam was tried and acquitted of one June 23, 1909 sale, but not the second. *Id.* The Kansas City Court of Appeals concluded that, Tatman was tried on both sales during the July trial because there was evidence presented regarding both sales. *Id.* The court noted that the prosecuting witness "testified positively that he was examined before the justice as to both sales, and that he told of both sales, one sale being of liquor or bitters, in a bottle of a certain shape and the other in a bottle of different shape." *Id.* The court found that the credibility of this testimony could not be refuted, and reversed Tatman's conviction. *Id.*

We disagree that *Tatman* represents precedent for Oglesby's contention that, if the State is aware of similar crimes a defendant may have committed against separate victims, the State is required to contemporaneously file charges on all known crimes or waive the ability to later do so if trial on any of those crimes results in acquittal. *Tatman* stands only for the proposition that a defendant may not be retried for a crime he/she has already been tried and acquitted. "The Fifth Amendment guarantee against double jeopardy embodies the doctrine of collateral estoppel." *State v. Cusumano*, 399 S.W.3d 909, 914 (Mo. App. 2013). "'Collateral estoppel bars relitigation of a specific fact or issue that was unambiguously determined by a previous jury.'" *Id.* (quoting

6

*State v. Simmons*, 955 S.W.2d 752, 760 (Mo. banc 1997)). "Collateral estoppel 'does not even begin to come into play unless the defendant has been acquitted in the first trial.'" *Id.* at 915 (quoting *State v. Moton*, 476 S.W.2d 785, 790 (Mo. banc 1972)). Oglesby expressly rejects that he is making a collateral estoppel argument, but *Tatman* is clearly a collateral estoppel case.[1]

Here, Oglesby fails to show how his acquittal on four charges regarding statutory sodomy and/or sexual misconduct against K.O. determined that Oglesby did not sodomize or sexually molest A.O. or N.O. Oglesby argues that he "was acquitted at the first trial of offenses related in time, place, and manner to those in the June 2018 indictment" and "[i]t is the effect of that acquittal on *subsequent* charging decisions that is at issue." Yet, not only were the alleged victims of the crimes different in the acquitted charges versus the new charges, but the charges for which Oglesby was acquitted allege a different *manner* of sodomy/molestation than alleged in the later charges. The jury acquitted Oglesby of three counts involving *Oglesby's penis* and K.O., and one count involving *Oglesby's mouth* and K.O.'s genitals. The jury could not reach a verdict regarding two counts involving Oglesby's hand and K.O.'s breasts, and two counts involving Oglesby's hand and K.O.'s genitals. None of the new charges filed against Oglesby involved allegations of Oglesby's *penis* coming into contact with K.O., A.O., or N.O., or Oglesby's *mouth* coming into

---

[1] Unlike the 1909 liquor sale laws, there is no law or precedent here which states that, if evidence of one specific act is discussed in a trial regarding another specific act, the individual cannot be tried separately on any of the additional crimes for which evidence was heard. In the 1909 liquor law discussed in *Tatman*, the "manner" of any violation would always be the same, as the "manner" would always be a sale. As long as a sale occurred, the "place" would have been irrelevant under that law except to establish jurisdiction and venue. Uniquely, the "time" of the offense, even if the charge specified a certain date, allowed for evidence which spanned the entire year prior to the charge being filed. Yet, contrary to Oglesby's contention, nothing within *Tatman* states that, because the State brought one charge within that year it waived its right to bring the second charge that occurred within that time frame. The reason the State was barred from bringing the second charge was because the State had already tried Tatman under the law on that very specific instance of Tatman allegedly selling a bottle of bitters when evidence was introduced regarding that specific instance.

7

contact with K.O., A.O. or N.O.'s genitals. All new charges involved Oglesby's hands coming into contact with the children's breasts or genitals – a "manner" of abuse that the jury could not reach a verdict on in the first trial.

Oglesby appears to argue, nevertheless, that all of the new charges are related in time, place, and manner to the acquittals by reason of being sexual offenses which occurred in his home over a span of two years. Yet, taking Oglesby's argument to its logical end, the acquittals on the sexual offenses involving K.O. that occurred in Oglesby's home over a span of two years would, therefore, preclude retrial on the four counts the jury could not reach a conclusion because all counts in that trial involved alleged illegal sexual activity within Oglesby's home during a specified time frame. Yet, retrial is permitted because, regardless of the fact that these alleged crimes were similar because they involved sexual activity between Oglesby and his minor child, Oglesby was charged with committing separate offenses on separate occasions in specified locations within the home. *See State v. Clark*, 494 S.W.3d 8, 13 (Mo. App. 2016); *State v. Celis-Garcia*, 344 S.W.3d 150 (Mo. banc 2011). Pursuant to Section 556.041, RSMo 2000, "When the same conduct of a person may establish the commission of more than one offense he may be prosecuted for each such offense." Further, "[w]hen the same conduct results in harm to two or more victims, double jeopardy is not violated if a defendant is convicted for the harm to each victim." *State v. Smith*, 456 S.W.3d 849, 853 (Mo. banc 2015).

Finding no support for his position in criminal law, Oglesby turns to civil law. Oglesby argues that, prohibiting additional charges to be filed regarding additional victims after acquittal on charges regarding one victim is "akin to the rule against piecemeal litigation in civil cases, a component of claim preclusion" which requires pleadings to include any claims belonging to the

8

subject matter of the litigation which the parties could have brought forward at that time. Yet, unless incorporated, civil rules do not govern criminal law, and vice versa. Criminal Rule 23.05 states that, even in cases where several offenses of the same or similar character are based on two or more acts that are part of the same transaction or are connected, or that constitute parts of a common scheme or plan, the State "may" charge the defendant in the same indictment or information in separate counts. The State is not required to do so.[2]

We conclude that Oglesby has failed to make a threshold showing that a double jeopardy violation is determinable from the face of the record.

Oglesby's first point on appeal is denied.

### Point II – Prosecutorial Vindictiveness

In his second point on appeal, Oglesby contends that the circuit court erred in denying his motion to set aside the verdicts on the charges from the June 2018 indictment and order a new trial on the remaining four charges. He argues that, under the doctrine of prosecutorial vindictiveness pursuant to constitutional due process, the State is prohibited from adding charges it could have brought earlier once a defendant exercises his right to a trial, is acquitted or obtains a mistrial, and when evidence on unlawful charges is intertwined with that on lawful charges. He contends that, a new trial is required on the lawful charges in this case because the State repeatedly admitted it could have brought the later-filed charges against Oglesby prior to his first trial, and brought them only after Oglesby was acquitted of four charges and the jury was unable to reach a verdict on four others. He contends the evidence presented regarding the later-filed charges was intertwined with

---

[2] We note that, even if *Tatman* were to stand for the proposition advocated by Oglesby, *Tatman* was decided well before Rule 23.05(b) became effective in January 1980.

the evidence presented on the remaining four charges from the first trial, and the State gave no objective, on-the-record explanation for its conduct.

Oglesby insists this constitutional due process issue was preserved for review because he raised it for the first time in a motion for new trial. It was not. "The rule is clearly established that in order to preserve a constitutional issue for appellate review, it must be raised at the earliest time consistent with good pleading and orderly procedure and must be kept alive during the course of the proceedings." *Kirk v. State*, 520 S.W.3d 443, 457 (Mo. banc 2017) (internal quotation marks and citations omitted). This allows the trial court to "identify and rule on the issue and to give adequate notice to the opposing party." *Id.*

In response to the State's contention that the matter was not preserved, Oglesby counters with *State v. Brock* which merely states that an appellant failed to preserve a prosecutorial vindictiveness claim because his motion for new trial was untimely. 113 S.W.3d 227, 233 (Mo. App. 2003). The *Brock* opinion is completely silent with regard to the preservation history of that case, and for good reason. Even if the appellant initially preserved the claim by raising it at first opportunity, the untimely motion for new trial precluded review on appeal. *See State v. Quimby*, 716 S.W.2d 327, 331 (Mo. App. 1986) ("Preservation of the point and the opportunity for the court to review its ruling [on the pre-trial motion to dismiss for prosecutorial vindictiveness] were accomplished when the point was included in the new trial motion.") And, while claiming the State offered no authority but a MISSOURI PRACTICE article to support its position that the issue is unpreserved, Oglesby ignores the State's reliance on *State v. Edmond*, 363 S.W.3d 431, 433 (Mo. App. 2012), which discusses that constitutional claims must be raised at first opportunity, and also ignores the State's reference to Missouri Supreme Court Rule 24.04(b)(2) which provides:

> Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver.

While Oglesby cites *State v. Quimby*, 716 S.W.2d 327 (Mo. App. 1986), several times throughout his briefing for the proposition he wishes to extrapolate from that case, he completely ignores that, unlike *Brock*, *Quimby* expressly sets forth what is required to preserve a prosecutorial vindictiveness claim.

In *Quimby*, the State contended that a prosecutorial vindictiveness allegation involving the State dismissing a misdemeanor charge, and refiling with a felony charge after the defendant requested a jury trial, was not preserved because the defendant moved to dismiss the felony indictment prior to trial but did not renew the motion during trial. *Id.* at 331. The *Quimby* court stated:

> Under Rule 24.04(b) 2, a motion such as was presented by appellant based on defects in the institution of a prosecution, must be raised before trial and, under Rule 24.04(b) 3, the motion is to be heard and determined before trial, unless ordered deferred by the court. In this case, the motion was heard and ruled before trial commenced, the constitutional issue was cited in the original motion and was preserved in appellant's motion for new trial…. Preservation of the point and the opportunity for the court to review its ruling were accomplished when the point was included in the new trial motion.

*Id.*

In *State v. Cortez-Figueroa*, also a prosecutorial vindictiveness claim, we distinguished *Quimby* on the grounds that the defendant in *Quimby* timely preserved the issue for review by complying with Rule 24.04(b)(2), but Cortez-Figueroa did not. 855 S.W.2d 431, 439 (Mo. App. 1993). We stated: "Whether the State enhanced a charged offense because a defendant demanded

11

his right to jury trial is an issue that must be timely raised to permit the trial court to consider and address the issue before trial." *Id.* In reviewing Cortez-Figueroa's claim for plain error, we concluded:

> Mr. Cortez–Figueroa failed to present his objection by motion to the trial court before trial as required by Rule 24.04(b)(2). His objection does not allege that the court lacked jurisdiction. Neither has he alleged good cause for failing to timely assert his objection. Pursuant to Rule 24.04(b)(2), he waived the objection. To permit Mr. Cortez–Figueroa to decline to timely assert before trial any right he might have to oppose the enhancement of the charge and then to raise the issue for the first time on appeal would permit him to avoid the requirement of Rule 24.04(b)(2) and 'sandbag' the state. Mr. Cortez–Figueroa has not established plain error. Point 2 is denied.

*Id.* at 439-40.

Oglesby's claim was similarly waived, and likewise fails to establish plain error. Oglesby not only waited until after he was convicted of all charges to allege prosecutorial vindictiveness regarding the prosecution of seven of those charges, he made no attempt in his motion for new trial to show cause, as required by Rule 24.04(b)(2), why relief should be granted from this waiver. The record reflects that Oglesby was well aware when the State filed the additional seven charges that the State had knowledge of evidence regarding additional victims during the pendency of the first trial, because in December 2017 the State issued notice to Oglesby of its intent to use child witness statements[3] of R.O., A.K.O., and A.L.O. in the first trial. The notice alleged that A.K.O. and A.L.O. were not only witnesses to Oglesby's alleged abuse of K.O., but Oglesby had abused A.K.O. and A.L.O. as well. On March 9, 2018, the court conducted a 491.075 hearing on the State's motion. On March 12, 2018, the court issued an order allowing for admission of hearsay

---

[3] Pursuant to Sections 491.075 and 492.304, RSMo.

12

statements made by these children to specified Children's Division workers, therapists, and forensic interviewers. Oglesby's first trial, which resulted in a hung jury on four counts, was held in May 2018, and Oglesby was thereafter charged with seven additional counts involving different victims and different instances of abuse. The State moved, unopposed, to join the two cases, and trial was held in January 2019 on all counts. In February 2019, Oglesby first raised his claim of prosecutorial vindictiveness.[4]

We find that this case evidences the "sandbagging" concerns expressed in *Cortez-Figueroa*. After waiving his claim and without showing cause for relief from that waiver, Oglesby now contends this court must presume an improper vindictive State motive due to the State filing the charges after Oglesby exercised his right to trial, and then conclude the State failed to rebut this presumption of vindictiveness by not providing an objective, on-the-record explanation in response to Oglesby's claims. Yet, in response to Oglesby's motion for new trial, the State offered that it could "readily articulate all of the reasons for the second indictment if the Court deems this

---

[4] Oglesby contends his claim of prosecutorial vindictiveness in his motion for new trial "was addressed by both parties without objection and decided on the merits," suggesting that if the lower court resolved the issue on the merits, we must as well. We need not, but note that the record does not confirm that the issue was decided on the merits. The court made the following statement in denying the motion:

> Let the record reflect the Court has read the -- both the motion for new trial and the motion for judgment of acquittal. At this time, upon consideration of the motions and the issues raised, and upon consideration of the Court being present for all the proceedings in both of the trials, the motion for judgment of acquittal is denied. The motion for a new trial is denied.

Although Oglesby was given an opportunity by the court to argue his motion for new trial, which included more than just the prosecutorial vindictiveness claim, nowhere in his motion or argument does he address the untimeliness of his claim or show cause why he should be granted relief from his waiver. Given the record, the court's statement in denying the motion, and the law on this issue, we will not presume that the court found Oglesby to have shown cause for granting relief from the waiver, and will not presume the issue was decided on the merits.

necessary at the hearing on the motion for new trial." At that hearing, when the State began to articulate its reasons for bringing additional charges, motion counsel objected:

> [STATE]: As far as vindictiveness is concerned, I didn't respond very specifically in my motion, and so I do at least want to make a brief record on that as far as why we brought those charges the second time. And I can tell the Court that it really was a matter of trial strategy. Our strategy the first time –
>
> [DEFENSE]: Your Honor, to the extent she's trying to give substantive evidence, I would object because she's not under oath from the stand. An attorney simply giving argument to a Court, under *State v. Bell*, which is a 2009 Court of Appeals case, is not evidence and can't be considered.
>
> THE COURT: Okay.
>
> [STATE]: Beyond that, Judge, even if trial strategy isn't going to be considered by this Court, I can say that something that is part of the record that the Court can take judicial notice of, there was a reason why the State did not seek an additional bond when the new charges were filed and, in fact, I believe the summons was issued. The State -- obviously, it was known to all of the parties that the defendant was out of custody on the first case. It did not seek to incarcerate or place the defendant in custody pending the second trial. And I do think that that speaks to the lack of vindictiveness. Additionally, obviously, there was not a plea or even -- I believe we made a *Frye* record -- or we might not have because I don't believe that there were any plea negotiations between either the first trial or the second trial. And so to say that it was some sort of vindictiveness for the defendant exercising his right to a trial, I don't think that there's any evidence to support that. And so, Judge, otherwise, for all the other points, I would stand on my motion as previously filed.

On appeal, Oglesby advocates that *Estate of Bell*, 292 S.W.3d 920 (Mo. App. 2009)[5], stands for the proposition that the prosecutor in this case gave no "on-the-record" explanation because

---

[5] We note that, although "*State v. Bell*" was recorded in the transcript as the authority relied upon by Oglesby at the motion hearing, there may have been a transcription error due to "*Estate of Bell*" being relied upon on appeal and appearing to be the same case Oglesby intended to reference at the motion hearing.

"unsworn argument" cannot be considered by the court. *Bell* cannot be extrapolated in this manner.

*Bell* involved an appeal of a trial court's approval of a personal representative's settlement in an estate matter. *Id.* at 921. The appeal alleged that there was no evidence introduced at the hearing from which the trial court could have concluded that the settlement was in the Estate's best interest. *Id.* at 922. In fact, the only information before the court at that hearing was unsworn commentary by the personal representative that was not subject to cross-examination. *Id.* Our standard of review on appeal was to affirm the trial court's ruling unless there was no substantial evidence to support the decision, it was against the weight of the evidence, or it erroneously declared or applied the law. *Id.* at 923. In our Opinion we discussed that, examples of evidence that a trial court *could use* to determine whether or not a settlement was in the best interest of an estate included taking judicial notice of claims filed by a party, the parties' stipulated facts, the parties' exhibits, and testimony of a personal representative. *Id.* We concluded that, because the only "evidence" before the court was unsworn testimony by a personal representative, the court had no "evidence" before it at all. *Id.* As such, the court's ruling was not supported by substantial evidence. *Id.* at 928.

*Estate of Bell* in no way stands for the proposition that, without a prosecutor being under oath, an explanation given by a prosecutor in defense against an allegation of prosecutorial vindictiveness, recorded by a court reporter at a hearing regarding the matter, cannot be considered an "on-the-record explanation" sufficient to disprove the allegation. Oglesby cites nothing but *Estate of Bell* to support his contention that the prosecutor's statements before the court in this case, captured by a court reporter, were not "on-the-record."

15

Strategically choosing to hold some charges in abeyance cannot, by itself, prove prosecutorial vindictiveness; and, even where a presumption of prosecutorial vindictiveness is applied, the prosecutor is still given an opportunity to offer an objective explanation. *State v. Gardner*, 8 S.W.3d 66, 70 (Mo. banc 1999). In *State v. Cayson*, 747 S.W.2d 155, 158 (Mo. App. 1987) ("*Cayson I*"), we found that a prosecutor made no on-the-record explanation to disprove a presumption of prosecutorial vindictiveness which arose after the defendant requested a new trial and the State added an additional charge arising from the same incident/transaction, but the prosecutor was entitled to an opportunity to do so. *Id.* We remanded for that opportunity. *Id.*[6] On remand, the motion court found that the filing of the additional charge was not motivated by vindictiveness. *State v. Cayson*, 785 S.W.2d 794, 795-796 (Mo. App. 1990) ("*Cayson II*"). When Cayson argued on appeal that the prosecutor's explanation was insufficient, we affirmed the motion court stating, "The finding was supported by the prosecutor's statement which the court chose to believe." *Id.* at 796.

Here, Oglesby admits to disrupting the prosecutor's explanation regarding the State's strategic reason for waiting to file the charges, stating in his brief on appeal that the prosecutor "did not present evidence, only unsworn argument by counsel, to which Mr. Oglesby objected and on which objection she stopped." Having disrupted the prosecutor's explanation regarding

---

[6] *Cayson I* involved the addition of a charge involving a second victim that arose out of the same incident. Unlike here, the prosecutorial vindictiveness claim in *Cayson I* was raised prior to trial. *Id.* Further, *Cayson I* clearly differentiates between cases where charges are enhanced after the exercise of a constitutional right, versus cases where additional charges are added which arise out of the same incident. The enhanced charge was prohibited altogether in *Cayson I. Id.* at 157. With regard to the additional charge, a presumption of a realistic likelihood of vindictiveness was erected, and the case was remanded to allow the prosecutor the opportunity to rebut this presumption, which the prosecutor did. *Id.* at 158. Neither *Cayson I* nor any other case cited by Oglesby involves later charges being filed which involve allegations regarding separate victims arising from separate incidents.

16

strategy with an objection unsupported by the law, Oglesby now argues that the prosecutor's "strategy" was necessarily "to keep some charges aside in case he was acquitted, in which case more would be piled on." We cannot accept that Oglesby now gets to define the State's "strategy" in a manner benefitting him when the prosecutor's attempts to explain its strategy were thwarted by motion counsel. A presumption of vindictiveness will not apply "if any objective event or combination of events in the proceedings should indicate to a reasonable minded defendant that the prosecutor's decision to increase the severity of the charges was motivated by some purpose other than a vindictive desire to deter or punish appeals." *State v. Potts*, 181 S.W.3d 228, 236 (Mo. App. 2005) (internal quotation marks and citation omitted). Regardless, unlike in *Cayson I*, the prosecution here provided *additional* explanations (aside from strategy) for why there was no prosecutorial vindictiveness. If the court did rule on the merits of this issue in denying Oglesby's claim, and this is not clear from the record, the court, which noted it had been present "for all the proceedings in both of the trials" necessarily found the explanations of the prosecutor credible. This credibility determination requires our deference when considering *de novo* whether Oglesby's constitutional rights were violated.[7] *State v. Sisco*, 458 S.W.3d 304, 312 (Mo. banc 2015) ("While

_____

[7] Oglesby argues that the explanations provided by the prosecutor here were insufficient "as a matter of law" because the prosecutor "had to show that it was impossible to proceed on the new charges at the outset." (*Citing Blackledge v. Perry*, 417 U.S. 21, 29 n.7 (1974)). Neither *Blackledge*, nor any other case cited by Oglesby, stands for this proposition. In *Blackledge*, the prosecution initially charged the defendant with a misdemeanor, and then dismissed and elevated that charge to a felony after the defendant was convicted of the misdemeanor and exercised his right to a trial de novo. *Id.* at 22-23. The United States Supreme Court found that it was not constitutionally permissible for the State to respond to the defendant's invocation of his statutory right to appeal by bringing a more serious charge. *Id.* at 28-29. The Court noted, however: "This would be a clearly different case if the State had shown that it was impossible to proceed on the more serious charge at the outset." *Id.* at 29 n.7. *Blackledge* does not address the scenario presented in this case - later charges being filed that involve different victims and separate incidents which did not arise from the same incidents alleged in the initial charges.

this Court defers to the trial court's factual findings and credibility determinations, it reviews questions of law *de novo*.").

We conclude that Oglesby waived his claim of prosecutorial vindictiveness and has failed to establish substantial grounds for believing there has been a manifest injustice or miscarriage of justice in the court's denial of his motion for new trial on the grounds of prosecutorial vindictiveness.

Point two is denied.

**Point III – Prosecutorial Misconduct**

In his third point on appeal, Oglesby contends the circuit court erred in denying a new trial due to alleged prosecutorial misconduct at a pretrial conference for the first trial. He argues that, in that pretrial conference the prosecutor deliberately misstated facts by telling the trial court that K.O.'s therapist said K.O. did not display signs or symptoms of reactive attachment disorder ("RAD"), which successfully convinced the trial court to bar any questions or testimony that K.O. had RAD. Oglesby argues that the trial court "reapplied this ruling to the second trial," and evidence of K.O.'s disorder was admissible but ultimately excluded. Oglesby argues that the therapist testified after the second trial that the prosecutor's statement was not true. Further, at the pretrial conference before the second trial, the prosecutor admitted that the therapist told her that K.O. had been diagnosed with RAD.

Motions in limine were filed regarding the exclusion of RAD information in both the first and second trials. Under Paragraph #6 titled, "Attacks on Victim's Character," the motion in limine in the first trial stated, in relevant part:

18

COMES NOW the State of Missouri, by and through the Assistant Prosecuting Attorney, Erin Hunt, and requests the Court to enter its order prohibiting Defendant or his Counsel from making statements in the presence of the jury, or adducing any testimony or evidence, concerning the following:

…

ATTACKS ON VICTIM'S CHARACTER

6.      "It is an elementary tenet of law that evidence as to a victim's character is inadmissible except in specific instances." *State v. Robinson*, 831 S.W.2d. 667, 670 (Mo. App. W.D. 1992). The defendant may not argue, refer to, or elicit testimony regarding specific acts of immorality on the part of the victim K.O.  Any reference to the victim's character, not relevant to any material issue, is improper and inadmissible. *See State v. Garrett*, 813 S.W.2d. 879, 882 (Mo. App. E.D. 1991); *State v. Harris*, 781 S.W. 2d. 137, 145 (Mo.App. W.D. 1989); *State v. Ivy*, 710 S.W.2d. 431, 433 (Mo. App. E.D. 1986); and *State v. Morris*, 668 S.W.2d. 159, 164 (Mo. App. E.D. 1984).

Witness statements and deposition questions have included topics such as K.O. having Reactive Attachment Disorder (RAD), sending naked pictures of herself to a boy or posting naked pictures on the internet, being disciplined for her social media use, looking at pornography, being hospitalized for behavioral issues, being "good at lying," stealing a phone, and an incident involving bras and underwear being found in K.O.'s foster sibling's bedroom. These specific behaviors and incidents are not relevant to this case and are improper character evidence. The only reason the defendant would attempt to put this type of evidence in front of the jury would be to unduly embarrass K.O.

At a pretrial hearing of the first trial, the following colloquy took place before the court on

this issue:

THE COURT:          … The next motion in limine is a motion in limine regarding attacks on the victim's character.  And I guess this one is the lengthy one, so could you expound a little bit more on that, Ms. Hunt?

[PROSECUTOR]:      Yes, Judge. Okay.  So as far as the victim's character is concerned, I mean, the State recognizes in this particular case there is not -- you know, we don't have DNA evidence, we don't have a confession or statements by the defendant, admissions by the defendant.  So largely this case is going to rest on the victim's credibility; there's no question about that.  However, there have been some things that have been raised, some issues that have been raised in interviews

19

by a lot of the witnesses, both State's and defense witnesses, regarding the victim's character in this case. Specifically, there's talk of her having been diagnosed at some point in her life with this reactive attachment disorder, or RAD. The State doesn't believe that there will be any person who will be qualified to say that this victim has been diagnosed with this reactive attachment disorder, or RAD. The victim herself denies ever knowing that she's been diagnosed with it.

And so, first of all, I don't believe that there would be sufficient foundation for the defense to comment on that; but, second of all, I don't believe even if she did have it, that it would be relevant to this case. So there's RAD. There is –

THE COURT: Let me stop you there, ma'am. Let's take up that issue.

[PROSECUTOR]: Sure.

THE COURT: Mr. McIntosh, is there an objection to that?

[DEFENSE]: There is, Judge. We believe that one of the State's witnesses, the therapist for the child, will talk about developing a history in her therapeutic approach with the victim. And that one of those things that she considered – she'll say she ruled it out, but she considered this reactive attachment disorder. So I would say it's fair game for me to explore as to why she ruled it out, what it is, that kind of thing.

[PROSECUTOR]: And, Judge, if I may respond. I mean, at the point that it's been ruled out, that means she doesn't have reactive attachment disorder. Therefore, it cannot be relevant to the victim and it would just be to impugn her character. We actually spoke to some of the defense witnesses that have previously treated this victim, and the defense witnesses -- Susan Peach specifically, who apparently was the family therapist for a long period of time -- said that the victim does not display signs and symptoms of this RAD. So I don't -- if she doesn't have it, then the fact that it's been ruled out, I can't imagine how that would be relevant or admissible in this case.

THE COURT: Anything further, Mr. McIntosh?

[DEFENSE]: No.

THE COURT: The motion in limine is sustained.

20

Prior to the second trial, the State filed another motion in limine that included a similar Paragraph #6. Prior to hearing argument on the new motion in limine, the court noted that the prior case and the new charges had been consolidated for one trial, and asked the parties if any rulings made by the court in the May 2018 motion in limine needed to be reargued, indicating the rulings would otherwise stand. Objections defense counsel made to the court's prior rulings were incorporated into the second trial. The State advised the court that, a new motion in limine had been filed in anticipation of the second trial, and there would be some overlap that might allow for skipping portions when the motion was taken up. The colloquy before the court at that time regarding the RAD issue was as follows:

> THE COURT: … No. 6 is a motion in limine regarding attacks on the victim's character. And this is the one that you were referencing, ma'am?
>
> [PROSECUTOR]: Yes, Judge. And this particular section, obviously, in addition to [K.O.], we also now have [A.O.] and [N.O.] that are victims of this case. This case, in addition to the criminal trial that's going on, there's also a Family Court case that's been happening. And Ms. Collins and myself have had the opportunity to witness portions of that, those proceedings. And so between the State's discovery, the defendant's discovery that they've provided to us, and the Family Court case, there's just a host of issues that have come up, in the Family Court case especially, but also in our case through depositions and such, that we wanted to address pretrial. So while the three girls are testifying, we're not – we're preventing any questions being asked of some of the topics that the State feels should not -- they should not be questioned about.
>
> I tried to list everything as specifically as possible for all three of the girls in this section. I don't believe there's anything, to my knowledge, that I have missed. So I don't know if it would be easier maybe for Mr. McIntosh if there are sections or portions that he specifically has an objection to. But there's at least one that I do want to address because Mr. McIntosh has endorsed and has indicated that he's going to call Susan Peach.
>
> Susan Peach was the family therapist for the Oglesby family while all of the children were living there. And one of the things that we anticipate -- and if I'm wrong on this, please let me know -- but one of the things we anticipate Ms. Peach

21

talking about, she is a licensed clinical social worker and she has indicated to us that [K.O.] and possibly one of the other girls exhibits -- or has been diagnosed by her with RAD, which is reactive attachment disorder. Last time we had talked about this, but it wasn't the State's anticipation that the defense was going to have anyone to testify -- qualified to testify about that diagnosis. I'm not even conceding that Ms. Peach is qualified to testify about that diagnosis. But I will say this: I am do know from Mr. McIntosh's notes and from our discussion with her that one of the indications or one of the things that comes along with RAD is lying.

Now, if Ms. Peach, her background, her training and experience, allows her to testify that [K.O.] has RAD, or reactive attachment disorder, I would submit that going that next step and saying that children with RAD lie would be impermissible and inappropriate character evidence. It would be very similar to me bringing in a physician or a doctor to say that in 98 percent of children who disclose abuse, 98 percent of those disclosures are true, that children don't lie. I obviously can't do that. I can't have someone comment on another witness' credibility or believability. And I think that is the same with diagnosing a child with this RAD disorder and then saying children with RAD lie.

So that's the one big thing that I wanted to make sure that we addressed. Otherwise, like I said, I don't know if Mr. McIntosh has specifics that he would object to in the motion. That might be the easier way to deal with it.

THE COURT: Mr. McIntosh.

[DEFENSE]: Not only will Susan Peach testify, I hope, but Nina Schunk, [K.O.'s] therapist, will testify. And I want to be permitted to ask about this RAD diagnosis as part of [K.O.'s] history. It's not a comment that Susan Peach qualifies; it says that she had RAD information and she talks about RAD. As long as she just talks about RAD as a symptom of her profession, as a diagnosis, and doesn't say that -- if she says a symptom of RAD is lying, I would suggest to the Court that should be permitted. To say [K.O.] has RAD, therefore [K.O]. is a liar, I wouldn't go there. That's the way I would ask the Court to define whether or not she can testify as to her diagnosis, slash, [K.O.'s] history. The same with Nina Schunk on the issues of what RAD constitutes. I believe both witnesses would not comment specifically on [K.O.] being a liar but simply that is a symptom exhibited by a patient with RAD.

…

THE COURT: …

22

Let's talk about the RAD issues, though. And the RAD issues, is Ms. Susan Peach and Ms. Nina Schunk qualified experts to testify regarding diagnoses?

[PROSECUTOR]: Judge, both of them are clinical licensed social workers. I actually -- I will tell the Court, I have found case law that is supportive of them being able -- of clinical licensed social workers in the state of Missouri, that they are able to testify regarding diagnoses.

THE COURT: Okay.

[PROSECUTOR]: I will tell you, though, I guess I say Susan Peach is a clinical licensed social worker. She has told me that. We've asked for her CV. We haven't received it yet. But, again, she wouldn't be my witness, so it would be up to Mac to lay that foundation. But as far as if her credentials are there, I do believe in the state of Missouri there is case law to support that.

THE COURT: The Court's ruling would be a limited ruling that you could certainly cross-examine her regarding the RAD and the factors that are counseled in RAD.

[PROSECUTOR]: Okay. So I just want to make sure that I understand. So she's going to testify that [K.O.] has this disorder and part of this disorder is lying?

THE COURT: No. She's going to testify that she has a disorder, okay? And that in her counseling and her treatment, okay, of what she did -- well, and the factors that are involved in that, or the symptoms that are involved. But unless there's proof that she can put the two together, that the child was actually – there's some specific evidence that the child had credibility issues, she can't testify to that.

[PROSECUTOR]: Okay. And so then one more piece to all of this is, although Susan Peach -- and maybe I didn't answer your question very articulately before. Although she claims to have diagnosed [K.O.] with RAD, I do think that we seriously question whether or not -- and I know this comes under cross-examination. I just want the Court to understand that in crossing her, and potentially with the evidence that we will put on beyond that, I mean, I just -- this could evolve into a minitrial of whether or not [K.O.] has this disorder. Because if we question whether or not Ms. Peach did accurately and adequately have the time, opportunity, and ability to assess and diagnose [K.O.] with this disorder, but then additional to that we believe that in order to make that diagnosis, there are pieces that are missing. And, like I said, I know that goes to cross-examination. But what I'm seeing is that we then could potentially be putting on evidence in rebuttal to

23

include a psychologist. And, also, I would like to just note that Nina Schunk is not going to say that K.O. has this. Nina Schunk would dispute that [K.O.] has RAD. And so I just want the Court to be aware that this could evolve into a minitrial whether or not [K.O.] has RAD.

THE COURT: And, obviously, we'll have to just see. Because it's obviously a collateral issue and so we're going to be governed by the rules of collateral issues, proof of collateral issues in the trial. Okay?

[DEFENSE]: Judge, can I ask for a clarification?

THE COURT: Yes.

[DEFENSE]: So if my witness Peach says the symptoms of RAD are lying, scratching yourself, crying at night, rolling over, can she be permitted to say that? As lying is one of the – let's say RAD has six criteria and one of them is lying, one of them is the other things that I described. Is your order saying –

THE COURT: Yes, my order is saying you can ask are those the symptoms of RAD, yes.

[DEFENSE]: Okay.

THE COURT: All right. Anything further on No. 6, Ms. Hunt, Mr. McIntosh?

[PROSECUTOR]: Judge, I don't believe so, as long as Mr. McIntosh has reviewed everything. …

At trial, Oglesby did not call Susan Peach or Nina Schunk to testify regarding K.O.'s purported RAD diagnosis as allowed by the court.

Approximately three weeks after the jury returned guilty verdicts on all counts against Oglesby, Susan Peach signed an affidavit which was attached to Oglesby's motion for new trial. The affidavit states that K.O. had been diagnosed with RAD well before being placed with the Oglesby's and that, "Had I been called to testify at Mr. Oglesby's trial, I would have done so under oath and explained all of the foregoing in this affidavit." She further states that, on May 17, 2018,

24

the prosecutor called her regarding Oglesby's case and asked whether K.O. had been diagnosed with RAD. Peach told the prosecutor that K.O. had been diagnosed with RAD, and that Peach agreed with the diagnosis. Peach testified similarly at the hearing on Oglesby's motion for new trial. Peach's husband also provided an affidavit and testified at the hearing on Oglesby's motion for new trial. Peach's husband stated that he knew Oglesby through church, had helped Oglesby on one occasion in Oglesby's home, and "had the honor of performing his son's wedding." Peach's husband stated that he heard the speakerphone conversation between his wife and the prosecutor, and supported his wife's recollection of the conversation.

We find that Oglesby omits some very essential facts necessary to our determination of this issue when arguing his points on appeal. He completely omits from his opening brief that the court revisited its RAD ruling prior to the second trial and determined that Peach could testify. Despite the clear record, he argues in his opening brief that all of the court's prior rulings carried through to the second trial and the court barred "any questions or testimony that K.O. had RAD." It is not until Oglesby's reply brief that he concedes the court allowed Peach's testimony, but still argues that the court's prior rulings prohibiting other witnesses from testifying regarding K.O. having RAD were "left in place."

First, even if the prosecutor's statement to the court prior to the first trial was inaccurate, and we discuss below why Oglesby fails to prove this, any prosecutorial misconduct claim involving that statement is now moot. *State v. Letica*, 356 S.W.3d 157, 162 n.4 (Mo. banc 2011). Allegations of prosecutorial misconduct that were remedied by the circuit court's declaration of a mistrial and the subsequent trial are no longer cognizable. *Id.* Here, the RAD issue was revisited prior to the second trial with a new motion in limine. That motion was argued and ruled on. The

25

court granted the defense's request to introduce evidence regarding RAD and whether K.O. had a diagnosis of RAD. Although the defense indicated an intent to call both Susan Peach and Nina Schunk for this purpose, the defense called neither.

"[T]he touchstone of due process in cases involving prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *State v. Roberts*, 948 S.W.2d 577, 605 (Mo. banc 1997). Oglesby's claim that a statement by the prosecutor prevented him from receiving a fair trial because it prevented the admission of certain evidence is simply disingenuous where the record is clear that the court granted his request to admit the evidence. Oglesby's claim in his reply brief that the trial court only carved out an exception for Peach in its new ruling, and prohibited testimony from any other witnesses on the issue, is equally disingenuous. In the colloquy discussing the RAD issue, K.O.'s therapist, Nina Schunk, was mentioned by the defense as someone else who would testify regarding RAD and who the defense intended to call as a witness. The prosecution advised that a psychologist might be called by the State to rebut the defense's evidence. The court prohibited none of this proposed evidence. Oglesby completely avoids any discussion of Nina Schunk or other proposed witnesses discussed in that colloquy and now claims that, "had it been allowed, Mr. and Mrs. Oglesby themselves would have testified about K.O.'s RAD diagnoses." Yet, even if Mr. and Mrs. Oglesby's lay testimony were admissible on such an issue, the trial court was never asked this question and there is absolutely nothing in the record to support that the defense ever intended to question Mr. and Mrs. Oglesby, who did testify, regarding the purported RAD diagnoses. Moreover, if Oglesby truly believed that the court was improperly excluding relevant and necessary evidence, Oglesby was required to make an offer of proof regarding this evidence to preserve the issue for review.

26

[T]o preserve a claim of improperly excluded evidence, the proponent must attempt to present the excluded evidence at trial, and if it remains excluded, make a sufficient offer of proof. An offer of proof is required to demonstrate to the circuit court what the rejected evidence would show, educating the circuit court as to the admissibility of the proffered testimony, and allowing the circuit court to consider the testimony in context. Offers of proof must show what the evidence will be, the purpose and object of the evidence, and each fact essential to establishing admissibility.

*State v. Michaud*, 600 S.W.3d 757, 761-762 (Mo. banc 2019) (internal quotation marks and citations omitted). Oglesby made no attempts to offer, and no offers of proof regarding, the evidence he now claims was improperly excluded.

With regard to the alleged inaccurate statement made by the prosecutor prior to the first trial, Oglesby alleged in the motion for new trial that the prosecutor "represented to the Court that she had recently spoken with Susan Peach, K.O.'s counselor, and that *Ms. Peach had reported K.O. had not been diagnosed with RAD*." This was not what the prosecutor represented. The prosecutor's actual statement, made *after* defense counsel told the court that the child's individual therapist had "ruled out" a RAD diagnosis (but the defense wanted to introduce that the diagnosis had been "considered" and the reasons it was ruled out), was: "We actually spoke to some of the defense witnesses that have previously treated this victim, and the defense witnesses – Susan Peach specifically, who apparently was the family therapist for a long period of time – said that the victim *does not display signs and symptoms of this RAD*."

As shown above in the colloquy which occurred at the hearing on the initial motion in limine, the prosecutor acknowledged that there had been "talk of [K.O.] having been diagnosed at some point in her life with this reactive attachment disorder, or RAD." The prosecutor never averred that Peach stated K.O. had not been *diagnosed* with RAD. The State's primary contention

27

prior to the first trial was that the State did not believe there would be anyone *qualified to testify* regarding any such diagnosis. Prior to the second trial, however, the State reported that it had researched the issue and discovered that a licensed clinical social worker, such as Peach, could testify regarding such diagnoses. The State conceded that, although Peach had not yet produced her credentials to the State, if she was a licensed clinical social worker she could testify regarding K.O.'s RAD diagnosis.

The record reflects that Peach was the family therapist in the Oglesby home well before K.O.'s placement there in 2014, as she testified to providing therapy to Mr. and Mrs. Oglesby and some of their other adopted children beginning in 2009. Due to Peach's personal cancer diagnosis and treatment, she ceased providing therapy to the family and K.O. in July 2016. This was around the time the allegations were made by K.O. against Oglesby. By Peach's own account, she had not provided therapy to the family for approximately two years at the time of her 2018 conversation with the prosecutor. Peach stated in her affidavit/testimony that, when asked by the prosecutor if K.O. had a diagnosis of RAD, she told her "that K.O. did in fact have the diagnosis of RAD, we discussed that it was given to her prior to K.O. first meeting with me, but that I concurred with the diagnosis. I then told the prosecutor about K.O.'s history about RAD." Peach attached to her affidavit a letter written *four years prior* to a Children's Division worker. This letter discusses the "current diagnosis" of K.O., and states that "further diagnostic assessment is still being done using the CBDT and TSCC."

Significantly, nothing within Peach's affidavit discusses what Peach advised the prosecutor about "signs or symptoms" of RAD that K.O. displayed at the time of their conversation, or even at the time K.O. reported the abuse. It is entirely possible that one might exhibit signs and

28

symptoms of a condition and receive a diagnosis, and four years later no longer exhibit those signs and symptoms despite the prior diagnosis. In fact, Peach states in her affidavit that, "A person with RAD *can learn to recognize and control their emotions and actions that are symptomatic of their attachment disorder*, which was the Oglesby's goal for K.O. with respect to her RAD."

Hence, contrary to Oglesby's claim in his motion for new trial alleging prosecutorial misconduct, the prosecutor *never stated to the court* that Peach said K.O. had not been diagnosed with RAD. Speaking in the present tense, the prosecutor told the court that Peach said K.O. "does not display signs or symptoms of this RAD." Nothing in Peach's affidavit or testimony denies that she made the statement reported by the prosecutor. Hence, even if this issue were not moot, Oglesby has supplied no evidence of prosecutorial misconduct.[8]

---

[8] Oglesby quotes the actual statement made by the prosecutor in the point relied on, yet still argues in the body of the point that "the prosecutor told the trial court before the first trial that K.O.'s therapist had told her K.O. did not have reactive attachment disorder," and that "[t]he prosecutor's deliberate, knowing misconduct in representing that the possibly dying Mrs. Peach had told her K.O. *did not* have RAD, which was *false*, swayed the trial court into preventing that at both trials." (Emphasis original). In the point on appeal regarding prosecutorial vindictiveness, Oglesby argues that "the prosecutor already had shown an unfair, vindictive lack of candor to the court at the time of the original trial when she stated Mrs. Peach had told her K.O. had not be [sic] diagnosed with RAD so that evidence of this could be excluded." These are weighty claims, all unsupported by the record.

We also find significant that, in the hearing on the State's motion in limine prior to the first trial, a distinction was made between the child's individual therapist, Nina Schunk, and Peach as the family therapist. The prosecution only referenced Peach as the "family therapist." Peach states in her post-second-trial testimony that she served as the family therapist and *also* provided individual therapy to K.O. "just at different times as she needed it." Oglesby uses this averment to argue that the prosecutor told the court pre-first-trial that, "*K.O.'s therapist* told her K.O. did not have reactive attachment disorder." The only information before the trial court at that May 21, 2018, motion hearing regarding "[K.O.'s] therapist" was supplied by defense counsel who stated that Nina Schunk was K.O.'s therapist and that Nina Schunk had ruled out a RAD diagnosis. Prior to that motion hearing, Nina Schunk testified at a March 9, 2018, Section 491.075 hearing that she was K.O.'s therapist and had been so since September 2016. Peach never testified prior to Oglesby's convictions. Yet, K.O. was questioned about Peach during cross-examination in *both* the first and second trials. K.O. testified that Peach provided "family therapy" to the family but never provided individual therapy to K.O. She testified that the family therapy occurred in the "living room." K.O. denied ever being alone with Susan Peach or there ever being a time Peach took K.O. aside to counsel her individually. Oglesby ignores this *evidence* that was before the trial court, and that he had the opportunity to counter it at trial if he could, instead arguing that Peach's status as "K.O.'s therapist" and Peach's averments that she personally diagnosed K.O. with RAD must now be accepted, for lack of contrary evidence, as a basis of finding trial court error. We disagree. The uncontroverted evidence before the trial court prior to and during both trials was that Peach never provided individual therapy to K.O.

Point III is denied.

## Point IV – Quashing Subpoenas to Depose K.O., A.O., and N.O.[9]

In his fourth point on appeal, Oglesby contends that the circuit court erred in quashing Oglesby's December 2018 subpoenas to depose K.O., A.O., and N.O., arguing Rule 25.12(a) guarantees defendants the power to subpoena witnesses for depositions on all material relevant to the subject matter in the action. He contends that, when new charges or witnesses are added, the defendant must have the ability to depose the witnesses about the new charges, and to prove an exception the State must present evidence. Oglesby contends he was initially only charged with offenses against K.O., and not A.O. or N.O., and N.O. did not testify at the first trial. When new charges were added alleging offenses against A.O. and N.O., he subpoenaed all three to be deposed about the new charges and what happened in the interim. He claims the State presented no evidence to oppose this, and the trial court made no finding of good cause when quashing the subpoenas. He contends he preserved this issue by opposing the State's motion at an off-the-record hearing, and then raising it in his motion for new trial.

We find this claim unpreserved. In response to Oglesby subpoenaing K.O., A.O., and N.O. for a second deposition, the State filed a "Motion for Protective Order and to Quash Defendant's Subpoenas for K.A.O., N.O., A.O., K.O. and Nina Schunk." Therein, the State argued that, in preparation for the jury trial in the case involving K.O., all of the Oglesby's adopted children, including N.O. and A.O. were deposed.[10] The State further argued that, although in the original

---

[9] Oglesby's Motion to Strike State's Supplemental Legal File, taken with the case, is denied.

[10] With the exception of an adopted child whose Guardian ad Litem in the family court intervened by filing a Motion to Quash based on the detrimental effect a deposition would have on that particular child.

30

case N.O. and A.O. were not charged victims, "the defense's theory of the case included presenting N.O. and A.O.'s own sexual abuse allegations to the jury in the trial pertaining to K.A.O." and that N.O. and A.O. had already been questioned about their own abuse allegations, "which are the same allegations that form the basis for the additional charges." Further, that by the time of trial, both K.A.O. and A.O. will have been deposed by the defendant, cross-examined by the defendant in the May 2018 jury trial, and cross-examined by the defendant in the family court case. The motion also stated that, "no new information or allegations of sexual abuse perpetrated by the defendant upon K.A.O., N.O., or A.O. have surfaced in the time between the previous deposition until now to warrant an additional deposition." The State argued that, requiring additional depositions of the children would not be in the best interest of the children, and would be unduly burdensome, unreasonable, and oppressive.

Oglesby argues that the Rules of Civil Procedure govern this issue and require reversal of his convictions because the court granted the State's motion in a docket entry and failed to articulate "good cause" pursuant to Rule 56.02(c) for a protective order and quashing the subpoenas. Yet, Oglesby filed no objection to the State's motion. Under Jackson County Local Rule 33.5.1, if Oglesby opposed the State's motion, Oglesby was required, within ten days following the filing and service of the State's motion, to "serve and file suggestions in opposition with citation of authorities and affidavits to be considered in opposition to the motion." Further, pursuant to Local Rule 33.5.1, any request for a hearing or oral argument "shall be filed with the suggestions of the party requesting the same." The State made no request for argument in its motion, and Oglesby filed no opposition to the motion or request for argument. Although Oglesby contends on appeal that he argued his objection to the trial court in an off-the-record hearing, there

31

is no record of what occurred in this "off-the-record" hearing where he faults the State for not presenting "on-the-record" evidence to support its motion.

A December 13, 2018, docket entry indicates that the State's motion was scheduled to be "taken up" at the same time as a Chapter 491 hearing on December 21, 2018. That docket entry states:

12/13/2018 **Order for Continuance**
IT IS HEREBY ORDERED that Defendant's Motion for Continuance is Sustained. The Court re-sets the Chapter 491 Hearing to December 21, 2018 at 10:15 am. The Court will take up State's Motion for Protective Order and Motion to Quash Defendant's Subpoenas filed on December 6, 2018 at that time.

On December 20, 2018, defense counsel filed an unopposed motion to continue the 491 Hearing due to defense counsel having been in the hospital until December 18, 2018, and advised not to return to work for the remainder of that week. There is no mention in that motion of continuing the matter of the State's Motion for Protective Order and Motion to Quash. The motion for continuance regarding the 491 hearing was granted December 21, 2018, and the 491 hearing was rescheduled for January 3, 2019. The State's motion for a protective order and to quash the subpoenas was also granted December 21, 2018, in a separate docket entry. The court's docket entry reads:

12/21/2018 **Order**
State's Motion for Protective Order and Motion to Quash Defendant's Subpoenas filed December 6, 2018 is SUSTAINED.

The record simply does not confirm Oglesby's contention on appeal that defense counsel objected to the State's motion. There is no record of a written objection as required by Local Rule 33.5.1. While Oglesby mentions that the docket entry and an appearance sheet evidence that a

32

hearing took place, neither the docket entry nor the appearance sheet suggest there was any opposition to, or argument regarding, the state's motion.[11]

We decline to review this claim for plain error as it is clear that the record does not facially establish substantial grounds for believing there has been a manifest injustice or miscarriage of justice in the court's denial of the second depositions. Oglesby does not dispute that, prior to his request to depose the children, he had previously deposed all three children and had the opportunity to cross-examine two of those children on two other separate occasions in two separate hearings. Unlike *State v. Rushing*, 232 S.W.3d 656 (Mo. App. 2007), relied upon by Oglesby, where new allegations were raised that had never previously been known to either the defense or the State, and the defendant proved he was deprived of the ability to question the alleged victim regarding those allegations prior to trial, Oglesby makes no showing that the prior depositions and cross-examinations here did not sufficiently address the allegations contained in the new charges. Where Oglesby's claim on appeal revolves around the alleged deprivation of a right to question the victims regarding specific incidents, and he acknowledges having questioned these victims previously, his failure to make any attempt to explain exactly what the prior questioning did not

---

[11] Beyond this, although Oglesby argues reversible error for the court's docket entry failing to "articulate any reason for granting the State's motion" and failing to document "good cause" for the ruling, Oglesby never requested a more detailed ruling from the court. Consequently, the trial court was not apprised of this alleged defect in its discovery ruling until after trial. Oglesby's claim is akin to raising a claim of error on appeal regarding the form or language of a civil/post-conviction judgment, or that such judgment fails to make statutorily required findings, without first raising the issue in a motion to amend the judgment under Rule 78.07(c). In those cases, allegations of error are unpreserved. The rationale for declining to recognize those claims applies equally here: "With only rare exceptions, an appellate court will not convict a trial court of error on an issue that was never presented to the trial court for its consideration." *McMahan v. Mo. Dep't of Soc. Servs. Div. of Child Support Enforcement*, 980 S.W.2d 120, 126-27 (Mo. App. 1998).

33

address that was essential to mounting a proper defense to the new charges reveals no manifest injustice.

Point IV is denied.

**Conclusion**

We conclude that the circuit court did not plainly err in denying Oglesby's motion to set aside the verdicts on the charges from the June 2018 indictment and order a new trial on the remaining four charges from the first trial. Oglesby fails to make a threshold showing that a double jeopardy violation is determinable from the face of the record. Further, the circuit court did not plainly err in denying Oglesby's motion for new trial on the grounds of prosecutorial vindictiveness. Oglesby has failed to establish substantial grounds for believing there has been a manifest injustice or miscarriage of justice in the court's denial of his motion. We additionally find no error in the circuit court's denial of Oglesby's motion for new trial on the grounds of prosecutorial misconduct. The record does not support Oglesby's claims of prosecutorial misconduct and, even if it did, the issue is now moot due to the court allowing the evidence Oglesby claims was improperly excluded in the first trial to be admitted in the second trial. Finally, the record does not facially establish substantial grounds for believing there has been a manifest injustice or miscarriage of justice in the court's quashing of Oglesby's subpoenas to take additional depositions of K.O., A.O. and N.O.

The circuit court's judgment is affirmed.

_____
Anthony Rex Gabbert, Judge

All Concur.

34